On or about December 14, 1988, Centon Electronics, Inc. ("Centon"), a California-based distributor of computer components, placed an order for computer chips with Brian Bonar d/b/a BBE Providing Solutions, a computer chips broker doing business in Huntsville. Centon received the chips from Bonar the following day, via overnight delivery, and immediately mailed a check to Bonar as payment in full. A few weeks later, Centon placed a second order for computer chips with Bonar. These chips, which were different from those previously ordered, were received by Centon the following day, and Centon again promptly mailed a check to Bonar as payment in full. On or about January 5, 1989, after one of its customers had failed to purchase a number of the computer chips that Centon had received from Bonar pursuant to the first order, Centon contacted Bonar and requested a "return merchandise authorization," which would have allowed Centon to return the excess chips to Bonar for a credit against Centon's next order. The evidence is in dispute as to whether Bonar agreed to issue this authorization. Centon presented evidence tending to show that Bonar agreed to issue the authorization on the condition that Centon would go ahead and place a third order for computer chips. Bonar testified, however, that he did not agree to issue the authorization. He maintained, instead, that he agreed to assist Centon in finding another purchaser for the chips. In any event, on *Page 1001 
or about January 10, 1989, Centon placed a third order for computer chips with Bonar. These chips, which were of the same variety as those shipped pursuant to the second order, were received by Centon the following day. Centon immediately mailed a check to Bonar for $266,973.30, the full amount of the third order; however, on January 12, 1989, Centon stopped payment on this check, without notifying Bonar. An internal stop payment memorandum prepared by an employee of Centon and dated January 11, 1989, stated that Centon needed to send certain chips back to Bonar but that Bonar was giving Centon "a hard time." On January 13, 1989, Bonar deposited the check for the third order into his account at AmSouth Bank, N.A.. On January 20, 1989, Bonar received three boxes of computer chips from Centon, along with a note, dated January 15, 1989, stating that the chips were being returned as per an agreement reached between Bonar and Centon that certain chips from the first order could be returned. Bonar immediately notified Centon that he would not accept the returned chips, but he advised Centon that he would attempt to find a buyer for the chips at a lower price if Centon wanted him to do so. He further advised Centon that he would ship the chips back to Centon if he did not receive an authorization to sell the chips. After receiving no response from Centon, Bonar shipped the chips back to California. On or about February 15, 1989, Centon again shipped the chips back to Bonar, who, again, shipped them back to Centon. Ultimately, Centon sold the chips at a reduced price. During this time, Bonar tried unsuccessfully to contact Centon for an explanation. Centon never notified Bonar that it had stopped payment on its third check. Bonar, who had written checks against his account after depositing the $266,973.30 check from Centon, was notified by AmSouth on February 21, 1989, that Centon had stopped payment on the check. AmSouth honored all the checks that Bonar drew against Centon's check, even though it had been notified that Centon had stopped payment on the check. Centon eventually paid Bonar $102,804.06 toward the third order.
AmSouth sued Bonar, alleging that Bonar had overdrawn his account and seeking to recover $266,401.31, plus interest and attorney fees. Bonar counterclaimed against AmSouth, alleging negligence and misappropriation of funds, and he filed a third-party complaint against Centon, alleging breach of contract and promissory fraud. Bonar sought both compensatory and punitive damages from Centon. Centon denied any liability to Bonar and counterclaimed against Bonar, alleging fraud in the inducement and money paid by mistake. Before trial, AmSouth and Bonar entered into a written settlement agreement, resolving their respective claims against each other. That settlement agreement, which resulted in AmSouth's dismissing its action against Bonar with prejudice, provided, in pertinent part, as follows:
 "1. AmSouth sued Bonar in the Circuit Court of Madison County, Alabama, in Civil Action Number CV-90-2049P, seeking recovery for an overdraft on Bonar's checking account which resulted from a check drawn by Centon Electronics, Inc. (being referred to in this agreement as 'Centon'), being returned by Centon's bank (after Centon had stopped payment on the check), payable to Bonar, which had been deposited into Bonar's checking account at AmSouth.
 "2. Bonar counterclaimed against AmSouth and filed a 'third-party' claim against Centon.
 "3. AmSouth and Bonar have determined that further litigation between them is not necessary to resolve the dispute between them, and have agreed that the terms of this Agreement represent a fair way to conclude the lawsuit between them, leaving only the lawsuit by Bonar against Centon to be resolved in court.
 "4. AmSouth is relying upon Bonar's Agreement to assign seventy percent (70%) of his claims against Centon to AmSouth and upon Bonar's representation and warranty that he would vigorously and diligently prosecute the claims against Centon and would fully cooperate with AmSouth in suing and *Page 1002 collecting the claims owed by Centon to Bonar.
". . . .
 "In consideration of the promises made by AmSouth to Bonar and by Bonar to AmSouth, AmSouth and Bonar agree that the following terms and conditions govern their agreement:
 "a. Relying upon the warranties and representations of Bonar, AmSouth shall promptly dismiss its complaint against Bonar, with prejudice.
 "b. Bonar shall promptly dismiss his counterclaim against AmSouth, with prejudice.
 "c. Except for the rights of AmSouth and Bonar arising out of this Agreement, the dismissals shall constitute a full and final release of any claims by, among, or between Bonar and AmSouth.
 "d. Bonar hereby and herewith assigns to AmSouth seventy percent (70%) of his claim against Centon, now pending as a 'third-party' action and agrees that AmSouth, at its election, may elect to separately state a claim against Centon based upon this assignment or otherwise. The intent of this paragraph is that Bonar does transfer to AmSouth seventy percent (70%) of the total amount he recovers from Centon, subject to the limitations set out in this Agreement."
(Emphasis added.)
AmSouth never filed a claim against Centon. Instead, the record indicates that AmSouth, by virtue of its settlement agreement with Bonar, was allowed to align itself as a party plaintiff with Bonar against Centon, and that AmSouth participated with Bonar in the presentation of evidence at trial. Immediately following the presentation of evidence by Bonar and AmSouth at trial, Centon moved for a directed verdict based on the following four arguments: 1) that AmSouth's dismissal of its claim against Bonar with prejudice precluded liability on Bonar's third-party complaint as a matter of law; 2) that Bonar assigned a percentage of his contract claim to AmSouth in violation of the rule set out in Kansas City,Memphis Birmingham R.R. v. Robertson, 109 Ala. 296,19 So. 432 (1896), prohibiting the splitting of a contract cause of action, and that Bonar's purported assignment of his fraud claim to AmSouth was void and unenforceable under the rule stated in All States Life Ins. Co. v. Jaudon, 228 Ala. 672,154 So. 798 (1934) (a cause of action sounding in fraud, being personal in nature, is generally non-assignable); 3) that Bonar had presented insufficient evidence to show that Centon never intended to pay the full price for the third order of computer chips; and 4) that Bonar had suffered no damage or loss as a result of his business dealings with Centon. The trial court directed a verdict in favor of Centon. AmSouth and Bonar immediately moved for a new trial, which the trial court granted. Centon appeals from the trial court's new trial order. For the following reasons, we affirm.
Centon makes the same arguments on appeal that it made in the trial court. With regard to the first argument — that AmSouth's dismissal of its claim against Bonar with prejudice precluded liability on Bonar's third-party complaint as a matter of law — we agree with Centon that Bonar's claims could not proceed as third-party claims after AmSouth settled with Bonar and dismissed its claim against Bonar. Rule 14, Ala.R.Civ.P. ("Third-party practice"), requires that the liability of a third-party defendant, such as Centon, be dependent on the outcome of the plaintiff's claim against the defendant/third-party plaintiff. See Southeast Mortgage Co. v.Mullins, 514 F.2d 747 (5th Cir. 1975); United States v. JoeGrasso Son, Inc., 380 F.2d 749 (5th Cir. 1967); see, also,Opinion of the Clerk No. 3, 345 So.2d 1338 (Ala. 1977). However, we do not agree that Bonar's complaint against Centon was due to be dismissed as a matter of law. Although the trial court did not state that its ruling denying the dismissal was based on any particular rule of civil procedure, the legal effect of the ruling was to sever Bonar's claims against Centon, thus allowing them to proceed independently of AmSouth's claim against Bonar. This was permissible *Page 1003 
under Rule 21, Ala.R.Civ.P., which provides:
 "Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately."
As a general rule, the original plaintiff and defendant are not prohibited from settling their dispute because of the presence of any third party impleaded under Rule 14. Modernage Homes v.Wooldridge, 55 Ala. App. 68, 313 So.2d 190 (1975). However, AmSouth's settlement with Bonar resulted in Centon's being improperly joined in the action. Bonar's claims against Centon were properly severed under Rule 21. See Key v. Robert M. DukeIns. Agency, 340 So.2d 781 (Ala. 1976).[1]
As to Centon's second argument — that it was entitled to a judgment as a matter of law on the contract and fraud claims because Bonar had assigned a percentage of his contract claim to AmSouth and had attempted to assign a percentage of his fraud claim — it appears to us from our review of the settlement agreement that although Bonar and AmSouth used certain language purporting to assign 70% of Bonar's claims against Centon to AmSouth, the actual intent of the agreement was that AmSouth was to receive 70% of any monetary recovery that Bonar received from Centon. The last sentence in paragraph d. of the settlement agreement states: "The intent of this paragraph is that Bonar does transfer to AmSouth seventy percent (70%) of the total amount he recovers from Centon, subject to the limitations set out in this Agreement." Our interpretation of the settlement agreement in this respect is also supported by the fact that although AmSouth aligned itself with Bonar and participated with Bonar in the presentation of evidence at trial, it never attempted to state a claim against Centon based on the settlement agreement. In fact, the settlement agreement specifically states that AmSouth was relying on Bonar to "vigorously and diligently" prosecute his claims against Centon. Thus, it appears that the intent of the settlement agreement was to replace whatever legal claim AmSouth had against Bonar with a contractual right to receive a percentage of any recovery obtained by Bonar from Centon.
With regard to Centon's third and fourth arguments — that Bonar presented insufficient evidence to show that Centon never intended to pay the full price for the third order of chips and that Bonar suffered no damage or loss as a result of his business dealings with Centon — the record shows sufficient evidence to warrant submission of Bonar's fraud claim to the jury. In Hearing Systems Inc. v. Chandler, 512 So.2d 84, 87
(Ala. 1987), this Court, quoting Purcell Co. v. SpriggsEnterprises, Inc., 431 So.2d 515, 519 (Ala. 1983), held:
 " 'The only basis upon which one may recover for fraud, where the alleged fraud is predicated on a promise to perform or abstain from some act in the future . . . is when the evidence shows that, at the time . . . the promises of future action or abstention were made, the promisor had no intention of carrying out the promises, but rather had a present intent to deceive. Robinson v. Allstate Insurance Co., 399 So.2d 288 (Ala. 1981). If such intent is not substantiated by the evidence, the fraud claim should not be submitted to the jury. The failure to perform, alone, is not evidence of intent not to perform at the time the promise was made. If it were, a mere breach of contract would be tantamount to fraud. Old Southern Life Insurance Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976). . . .' "
The evidence shows that Centon became aware on January 5, 1989, that it was not going to be able to resell some of the computer chips that it had purchased from Bonar pursuant to its December 14, 1988, order. Viewing the evidence in the light most favorable to Bonar, as we must do in *Page 1004 
accordance with our standard for reviewing the sufficiency of the evidence, see Anderton v. Gentry, 577 So.2d 1261
(Ala. 1991), we must accept as true Bonar's testimony that he did not authorize Centon to return the unsold chips. The credibility of Bonar's testimony in this regard is certainly bolstered by the internal memorandum that was apparently prepared by an employee of Centon the day before the stop payment order was issued on the check; that memorandum stated that Centon was having "a hard time" sending the chips back to Bonar. The evidence also shows that when Centon placed the third order for computer chips on or about January 10, 1989, it did not intend to pay the full amount for those chips. This is clearly evidenced by the fact that Centon issued the stop payment order on its check on January 12, 1989; in fact, Centon concedes that it issued its check for the full amount of the third order by mistake. There was sufficient evidence to create a fact question as to whether, as Bonar contends, Centon never intended to pay the full price for the third order of chips.
On the question of damages, Bonar alleged in connection with his fraud claim that he had suffered mental anguish as a result of his business dealings with Centon, and he sought both compensatory and punitive damages. The evidence was sufficient to submit the question of punitive damages to the jury. The evidence was also sufficient to allow the jury to determine whether Bonar was entitled to any damages for mental anguish. Finally, even though AmSouth honored all of Bonar's checks that were drawn against his account, we cannot agree with Centon that Bonar has no claim for pecuniary loss as a result of its failure to pay the full amount due on the third order of chips. First, the collateral source rule would apply to Bonar's fraud claim. That rule provides that benefits received from a source wholly independent of the wrongdoer in a tort case should not be taken into account in computing the plaintiff's recoverable damages. Ensor v. Wilson, 519 So.2d 1244 (Ala. 1987). The rationale behind this rule is that tortfeasors should not be permitted to obtain a "windfall" by allowing them credit for the reasonable value of benefits that injured parties have received from third persons. See 22 Am.Jur.2d Damages § 566 (1988). Thus, Bonar's damages are not due to be reduced by the amount that AmSouth has paid to or for Bonar or by the amount of any monetary benefit that Bonar might receive by virtue of his settlement agreement with AmSouth, which requires Bonar to pay to AmSouth only 70% of any recovery that he receives from Centon. Second, it is a basic tenet of contract law that damages for a breach of contract should not put the injured party in a better position than he would have been in if there had been performance; however, it is equally well settled that damages for a breach of contract should return the injured party to the position the party would have been in had the contract been fully performed. Garrett v. Sun Plaza DevelopmentCo., 580 So.2d 1317 (Ala. 1991); Zippy Mart of Alabama, Inc. v.A B Coffee Service, Inc., 380 So.2d 833 (Ala. 1980); see, also, 22 Am.Jur.2d, supra, § 568. Consequently, although the collateral source rule is not applicable to a claim for breach of contract, Bonar is not precluded as a matter of law from recovering under his contract claim on the ground that he suffered no damage or loss. If Centon breached the contract, as Bonar contends, then Bonar's damages for breach of contract would be the amount to which AmSouth is entitled under the settlement agreement, for an award of that amount would vindicate Bonar and, in effect, restore him to the position that he would have been in, vis-a-vis AmSouth, had Centon fully performed. Bonar cannot, by virtue of his settlement agreement with AmSouth, receive a windfall as a result of a verdict in his favor on the contract claim.
We hold, therefore, that the trial court did not err in setting aside the directed verdict for Centon and reinstating this case to the trial docket.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES and KENNEDY, JJ., concur.
[1] It does not appear from our review of the record that a new case number was assigned to Bonar's suit against Centon. Normally, a new case number should be assigned once a claim is severed from the main action. See Key v. Robert M. Duke Ins.Agency, supra; Opinion of the Clerk No. 3, supra. *Page 1005