I must respectfully dissent. Unfortunately, the trial court's judgment in this case turns the concept of justice entirely on its head, rewards the unjust, and punishes a legitimate business for attempting to protect itself from theft. I do not see how any business can long survive when it loses its merchandise through shoplifting and then gets punished for seeking to enforce the laws against theft. I hope the kind of "legal" action this plaintiff engaged in is not occurring throughout the entire State of Alabama. However, if this kind of "legal" action — where a person shoplifts, is arrested, and then sues for malicious prosecution — is confined to certain counties in Alabama, I suspect we will continue to see an exodus of businesses from those counties, followed inevitably by the resulting economic decline that increases the poverty of those counties and the covetous desire to empty the coffers of the businesses that remain. The depressing cycle is easy to predict, but extremely difficult to stop, much less reverse. The corrosive effect of such a judgment as we have before us calls for this Court to exercise greater care in reviewing jury verdicts. This Court must, of course, by law, defer to the presumed "correctness" of a jury verdict; however, as a Justice on this Court, I will scrutinize such verdicts with great care, always within the standards set by this Court, and I *Page 186 
will leave no stone unturned in an effort to prevent the self-destructive economic and judicial effects that inevitably arise from unjust verdicts.
This Court has stated the standard of review for jury verdicts in civil cases:
 "`Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party; and we indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust.'"
Charter Hosp. v. Weinberg, 558 So.2d 909, 911 (Ala. 1990) (quotingCampbell v. Burns, 512 So.2d 1341, 1343 (Ala. 1987)). See also Williamsv. Williams, 786 So.2d 477 (Ala. 2000) ("that presumption is strengthened by the trial court's denial of the motion for a new trial").
I have tried my best in this case to look for the "reasonable inferences" the jury could have drawn that might support its verdict and damages awards. However, in doing so, I reach a conclusion opposite to that of the majority; I think "the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust." Charter Hosp., 558 So.2d at 911. Let us examine those facts.
The plaintiff LaShawna Goodman claimed that she bought the telephone that is the subject of this action, in order to give it to a friend for Christmas. She testified that she saw it advertised in a Wal-Mart advertising flier. Yet, no telephone was offered in a Wal-Mart advertising flier the week before the alleged purchase. (R. 1761-65.) After she was found not guilty on a charge of stealing the telephone, she said she did not give the telephone to the friend because Christmas had already passed once she received the telephone back from the Opelika Municipal Court; that court found her not guilty of theft, in March 1996. She said she threw the telephone away because, she said, it did not work. When Wal-Mart sought to obtain the telephone, in order to test whether it had been given the sticker that merchandise receives when a customer brings it in for return, Wal-Mart discovered that Goodman had thrown away the telephone and the box in which it had been packaged. The only evidence of the existence of that telephone was a photocopy of the back of the box she says had contained the telephone. Therefore, Wal-Mart could not test to see if a sticker had been applied to the box, as Goodman testified. Goodman claimed that the telephone did not work and that it was too late to return it to Wal Mart.[11] By Goodman's version of the *Page 187 
facts, she threw away the box after she had contacted an attorney about suing Wal-Mart.
Also, Goodman's friend Elizabeth Thomas testified that the receipt used by Goodman as a part of her defense in the criminal theft action against her was actually a receipt for a telephone that Thomas's husband had purchased for Ms. Thomas.[12] In other words, Goodman took a receipt for someone else's telephone and used it to claim that she had actually purchased the telephone that Wal-Mart accused her of attempting to steal. Goodman and her children lived with Thomas's family for a period of time.
The defense focused on the fact that Milner, the loss prevention associate for Wal-Mart who first stopped Goodman, had not attempted to discover the origin of the receipt that Goodman had in her possession. Milner answered that she had plainly seen Goodman take a telephone from the shelf in the electronics section of the Opelika Wal-Mart store and place it in the bottom of a bag in her cart.[13] She then followed her and watched her travel through the store and eventually leave *Page 188 
without paying for the telephone.[14] Milner never saw Goodman return to the customer-service desk, as Goodman testified she did. That is a critical fact, because Goodman claimed she had left the telephone at the customer-service desk. Either she had to return to that desk to pick up her telephone, or she stole a telephone from Wal-Mart. Milner also saw that the receipt produced by Goodman had been issued by a different Wal-Mart store a week earlier. Goodman argued at trial that Milner was under some kind of pressure from her supervisor to meet a quota of shoplifting stops. Milner denied this was the case, as did her supervisor.[15] Even if Milner *Page 189 
had been under pressure to meet a quota of stops, that certainly does not mean that she would lie about the facts in Goodman's apprehension or set up an innocent person for arrest.
At her trial, Goodman claimed that the telephone she was accused of stealing was a telephone she had purchased from a Wal-Mart store in Montgomery. She used Thomas's receipt to support her story. On that basis, the municipal judge found her not guilty.[16] She said she did not remember which Wal-Mart store in Montgomery she had purchased the telephone from or how to drive to that store from her doctor's office, where, she said, she had had an appointment — on December 17, 1995, a Sunday, and the same day she alleged she had purchased the telephone.
One "drawing reasonable inferences" from the evidence in this case would conclude that the jury did not evaluate the evidence at all but merely pitied Ms. Goodman's condition and predicament on the day before Christmas 1995.[17] The only logical inference one could draw from the evidence is that Goodman had a receipt that did not belong to her, that she took a telephone off the shelf in the Opelika Wal-Mart store, that she did not pay for that telephone before leaving the store, and that she tried to use the fraudulent receipt to escape punishment for her crime. She then had the audacity to sue Wal-Mart for malicious prosecution, even though the employees of Wal-Mart had acted professionally and Wal-Mart was within its rights to have Goodman arrested as a suspected shoplifter. The testimony of Milner, Thomas, and Reese is all logical and consistent, and none of it appears contrived. On the other hand, Goodman's testimony is, of course, self-serving and filled with short and nonexplanatory answers to questions, and it contradicts the testimony of the other key witnesses at trial. It makes much more sense to conclude that Goodman produced the fraudulent receipt in order to escape arrest and a criminal conviction for shoplifting than it makes to conclude that Wal-Mart produced the other witnesses in the case and induced false testimony in order to escape civil liability.
The trial judge should have granted Wal-Mart's motion for a judgment as a matter of law, because Goodman did not produce substantial evidence to support a finding of malicious prosecution or to support the jury's damages awards. Even if I *Page 190 
could vote to affirm the trial court's imposition of liability, I would demand a much greater remittitur of the punitive damages, because one could hardly call Wal-Mart's conduct in this case reprehensible. Wal-Mart had probable cause to have Goodman arrested, and it did not act maliciously in doing so. The effect of the trial court's judgment and of this opinion could be to encourage shoplifting in this State. I understand that sometimes criminals are able, by cunning manipulation of the criminal-justice system, to escape prosecution for their crimes. However, I do not want to see that unfortunate reality extended to include a criminal's quest to become a millionaire by cunning manipulation of the civil-justice system. I think that kind of manipulation caused the result in this case and that that manipulation poses a serious threat to the civil-justice system of this State. Therefore, I respectfully dissent.
[11] Goodman testified:
"Q. Where is the phone now?
 "A. The phone stopped working. I couldn't take it back to exchange it because it had so many days or months on it that you — ditto — so the phone was throwed away.
"Q. You threw the phone away?
"A. Yes. I couldn't do anything with it.
 "Q. Well, did you give the phone as a gift as you said you would?
 "A. No, because I didn't have it by Christmas. It was in evidence. Locked up. I didn't get the phone back until after the trial.
"Q. Did you save the box that the phone came in?
"A. I did up until I moved.
"Q. You did up until you moved.
"A. Um-hmmm.
"Q. Well, where is the box now?
"A. Throwed it away when I moved.
 "Q. Let me show you a document which was marked plaintiff's exhibit number two in an earlier deposition. She can look at either one. Will you tell me what that is?
 "A. This is the back of the telephone that I purchased. It is the box.
"Q. When was that document made?
 "A. Once I contacted to have Albert Bush [sic; Bulls?] be my attorney.
"Q. You still had the original box at that time.
"A. Yes."
Goodman Testimony, R. 1830-31.
[12] Elizabeth Thomas testified:
 "Q. I'll ask you to look at what has been marked as defendants' exhibit one, which is a copy of a receipt. Would you look at that, please, ma'am. Have you ever seen that receipt before?
"A. Yes.
 "Q. Let's talk about the times you have seen it; okay?
"A. Okay.
"Q. When did you first see it?
 "A. The very first time I saw this receipt is when my husband gave it to me after leaving Wal-Mart.
 "Q. Okay. And, then after you discovered that the receipt was gone — I understand what you are saying is you saw it on the day you purchased it, December 17; right?
"A. Yes.
 "Q. And then, after you discovered that the box and receipt were gone, when is the next time you saw it, that receipt?
 "A. It was August of `98, when Mr. Dave Donaldson come to my house.
"Q. Who is Mr. Dave Donaldson?
"A. He's a private investigator for Wal-Mart.
"Q. Did he show you the receipt?
"A. Yes.
"Q. Did he ask you about the receipt?
"A. Yes.
"Q. When was the next time you saw the receipt?
 "A. December 14, I think, it was, when I gave my deposition.
". . . .
 "Q. And, Ms. Thomas, is that the receipt for the phone that your husband purchased for you on December 17, 1995?
"A. Yes, it is.
 "Q. And, on that day, was LaShawna Goodman with you?
"A. Yes."
(R. 1840-41.)
[13] As the main opinion states, Goodman claimed that she left the telephone at the Opelika Wal-Mart customer-service desk, shopped, and then returned to the customer-service desk to pick up the telephone. That story, even when considered in light of the receipt that Goodman claimed she presented to Milner and said that she had obtained from a Montgomery Wal-Mart store, cannot be reconciled with Milner's testimony that she saw Goodman take a telephone from the shelf and put it in her bag in the shopping cart. Milner looked at the receipt Goodman showed her and saw that it was from another store and had been issued for a purchase on another date. There was no reason for Milner to accept that receipt as an explanation for Goodman's behavior.
[14] Milner testified:
 "A. First when I first observed her, Ms. Goodman was in the electronics department. She was taking a phone off the shelf. Ms. Goodman — excuse me — then proceeded to come out [sic] electronics with two bags of oil and a telephone on top of the buggy. When she left the electronics department, she went down action alley going toward the back of the store. Then she took a left and went all the way down to the domestics department. She went down the aisle looking around, looking for customers, as soon as someone — I assume she was looking for customers — soon as she saw someone coming up the aisles, she immediately left — she left domestics and went to the other side of the store, which is by little boys' wear. She went in little boys' wear. She was looking around, watching people around her. As soon as somebody came in that area, she left. She left little boys' wear and went through action alley and lingerie and had a conversation with a sales associate. When she left that area, she went all the way to domestics. It was the same thing. As soon as a customer came down the aisle in that area, she would leave. When she left that area she went down through automotives to sporting goods and the toy department and straight down the aisle and then she went on one of our garden center aisles, and then turned the corner, she went down the aisle. She took the motor oil and she put it all in one bag and put the telephone in the bag. Then, when she left there, she stopped by the fish tank, and when she left the fish tank she proceeded to go straight down action alley. I saw Margaret, this is our support team manager, and I asked her to go out with me. So, she came along with me. Ms. Goodman continued to come down and when she got to the checkout line, she went straight through the checkout line. She went outside. That is when I told her who I was and asked her to come with me.
 "Q. Now, let me ask you this. You say you saw her take the phone off the shelf?
"A. Yes, sir.
 "Q. You saw her put it in the top of the buggy and then she began to walk around?
". . . .
 "Q. And, let me ask you this: When she was walking through aisles where merchandise was situated, tell me what she was doing?
 "A. She was looking around. She was not looking at the shelves.
"Q. She was not looking at the merchandise?
"A. No.
". . . .
"Q. What was she looking at?
 "A. She was looking around, trying the [sic] see if someone was around her."
(R. 1630-33.)
[15] Michael Reese, Milner's supervisor, testified:
 "Q. Is it true — tell me whether or not loss-prevention associates are told that they have to make a quota or a goal in order to successfully perform.
"A. No, sir. I never tell associates that.
 "Q. And, in fact, that is not part of the Wal-Mart policy; is that correct?
"A. No, it is not.
"Q. Now, it is in the evaluation; correct?
"A. Yes, sir.
 "Q. And, it is, like, one of the 23 or 21 items in the evaluation?
"A. Yes, sir.
 "Q. Things like handling the situation professionally are in there; is that right?
"A. Yes, sir.
 "Q. And, communicating well with your supervisor, that's in there, too; isn't it?
"A. Yes, sir.
 "Q. Doing the job overall is in the evaluation; isn't that correct?
 "A. Yes, sir. There is a number of things in there from following proper guidelines to making apprehensions. There are a number of things."
(R. 1816-17.)
[16] Goodman argued at trial that Thomas's testimony about the fraudulent receipt was irrelevant to the question whether Wal-Mart maliciously prosecuted Goodman because Wal-Mart learned of the deceit with respect to the receipt after the fact. The question in this case was whether, using the information Wal-Mart had at the time of Goodman's arrest, Wal-Mart acted maliciously. It is quite clear that it did not. In having Goodman arrested, Wal-Mart used the eyewitness testimony of its loss prevention associate, a person trained and experienced in observing shoplifting. The receipt was introduced by Goodman at her criminal trial to obtain a not guilty verdict. Goodman used that not-guilty verdict to claim that she was "innocent" of any shoplifting in the Wal-Mart store on the day she was arrested. Wal-Mart attempted to rebut that evidence with Thomas's testimony and to impeach Goodman's testimony. If we accepted Goodman's argument that this information is irrelevant because Wal-Mart did not learn of it until after Goodman's arrest and her criminal trial, then, logically, we would have to say that Goodman's not-guilty verdict is also irrelevant because it occurred after the fact and Wal-Mart could not necessarily have predicted that result based on the information in its possession before the criminal trial.
[17] Ms. Goodman was pregnant, and her children were present when she was arrested.