W. Curtis Williams, the athletic director at Alabama State University ("ASU"), solicited Coach John L. Williams to come to ASU and serve as interim head basketball coach. ASU is located in Montgomery. During the negotiations, Coach Williams insisted that he would not leave his position as head basketball coach at Savannah State University, in Georgia, unless ASU was willing to commit to him for more than a one-year contract. In a letter dated October 13, 1995, Athletic Director Williams responded to Coach Williams, stating:
"Dear [Coach] Williams:
 "This is to confirm our agreement for you to serve as the Interim Head Basketball Coach at Alabama State University for the 1995-96 school year. You will have the opportunity of applying for the Head Coach position in 1996 with the other candidates.
". . . .
 "Further, you will be assured of the 1st Assistant Coach position for the year 1996-97, if you are not selected for the permanent position. We hope these conditions will meet with your approval, and we look forward to having you join us at Alabama State University on Monday morning, October 16, 1995. . . .
"Sincerely,
"W. Curtis Williams
"Director of Athletics"
Coach Williams testified that, relying upon this letter, he resigned from his coaching position at Savannah State and moved his family to Alabama. When he sent Coach Williams that letter, the athletic director had not received approval of the 1996-97 employment guarantee from ASU President Dr. William Harris, who had sole authority to bind the University in employment matters. Dr. Harris accepted Coach Williams as the interim head coach, but rejected any proposal to guarantee Coach Williams's employment beyond the one-year interim. Harris instructed the athletic director to notify Coach Williams of that fact and to inform him that he would be assured only of a one-year contract with ASU. The athletic director did not inform Coach Williams of that fact before Coach Williams resigned from Savannah State and relocated to Alabama. In fact, the athletic director did not inform *Page 479 
Coach Williams that Dr. Harris had rejected the second-year provision of the offer until after Coach Williams had finished his first year at ASU. At the end of the one-year interim, Coach Williams applied for the job as permanent head coach at ASU, but he was not hired. The record shows that he searched nationwide for employment, but was unable to find employment as a college coach. Eventually, he was employed at Selma Middle School for six months, and he later was employed full-time at Wallace State Community College in Selma as the head basketball coach.
Contending that the athletic director had promised him two years of employment and that he had relied on the athletic director's promise, Coach Williams sued ASU and several members of its staff and/or board of trustees, both in their official capacities and as individuals. The trial court dismissed all of the claims against ASU because of its immunity. The trial court also dismissed all but one of the claims against the members of the ASU staff and board, both as officials and as individuals. The one claim that remained was a count against Athletic Director W. Curtis Williams as an individual. Because the complaint alleged that the athletic director had acted fraudulently and outside the scope of his employment, he was not protected by qualified immunity. The athletic director petitioned this Court for a writ of mandamus directing the trial judge to enter a summary judgment in his favor based on the doctrine of sovereign immunity and Article I, § 14, of the Constitution of Alabama; this Court denied the petition on December 18, 1998. Ex parte Williams, Case No. 1980303.
After a trial on the merits, the jury found that the athletic director was liable to Coach Williams for breach of contract and fraud, and awarded Coach Williams $200,000 in compensatory damages and $150,000 in punitive damages. The court entered a judgment awarding Coach Williams $350,000. Athletic Director Williams appeals.[1]
The athletic director argues that Coach Williams failed to prove the elements of promissory fraud, and, therefore, that the trial judge erred in submitting the fraud claim to the jury. The defendant athletic director argues that because the fraud claim involved a promise to act in the future, the plaintiff was required to prove that the athletic director intentionally deceived him by making the promise. We have held that "`"[t]he only basis upon which one may recover for fraud, where the alleged fraud is predicated on a promise to perform . . . some act in the future . . . is when the evidence shows that, at the time . . . the promises of future action . . . were made, the promisor had no intention of carrying out the promises, but rather had a present intent to deceive."'" Centon Electronics, Inc. v. Bonar, 614 So.2d 999,1003 (Ala. 1993), quoting Hearing Systems, Inc. v. Chandler,512 So.2d 84, 87 (Ala. 1987), quoting, in turn, Purcell Co. v.Spriggs Enterprises, Inc., 431 So.2d 515, 519 (Ala. 1983). The athletic director claims that Coach Williams failed to prove a present intent to deceive, and, therefore, that the fraud issue should not have been submitted to the jury.
ASU President Harris testified that the athletic director "knew full well" that the position Coach Williams would be filling was only "a one-year job." Dr. Harris also testified that before the athletic director transmitted the offer to Coach Williams, *Page 480 
he had been put on notice by Dr. Harris that the position would be an interim position for one year. The jury had before it evidence from which it could find that the athletic director, knowing his lack of authority and knowing Coach Williams's insistence upon a term of more than one year, made an offer that exceeded his authority. When told by Dr. Harris, one day after he had made the offer, that he should retract that portion of the offer dealing with employment in excess of a year, he did not do so. Viewing the evidence most favorably to Coach Williams, as we must, we conclude that it would support the jury's apparent finding of promissory fraud.
The athletic director contends that he is protected from liability under the doctrine of State-agent immunity. See Ex parte Butts,775 So.2d 173 (Ala. 2000), adopting the restatement of the immunity rule suggested in Ex parte Cranman, [Ms. 1971903, June 16, 2000] ___ So.2d ___ (Ala. 2000). The defendant athletic director argues that contractual negotiations were left to his discretion and that he is entitled to be shielded from liability under this doctrine. However, it is undisputed that the athletic director did not have the authority to contractually bind ASU. Only President Harris was authorized to bind ASU contractually, and the athletic director knew that his authority was limited to negotiating employment contracts. Despite this knowledge, the athletic director represented to Coach Williams that a contract had been approved and, after being specifically told by Dr. Harris to advise Coach Williams of the misrepresentation contained in the letter, the athletic director failed to do so. The facts here support the conclusion that the athletic director did not have the discretion to act as he did. A state officer or employee is not protected under the doctrine of State-agent immunity if he acts willfully, maliciously, fraudulently, or in bad faith. Ex parte Butts, supra. The athletic director's fraudulent misrepresentations took him out from under the umbrella of immunity.
The athletic director argues that the evidence did not support the award of compensatory and punitive damages. "The jury's verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of the motion for a new trial." Friendly CreditUnion v. Campbell, 579 So.2d 1288, 1291 (Ala. 1991). See also Stokes v.Long-Lewis Ford, Inc., 549 So.2d 51, 52 (Ala. 1989); Merrell v. JoeBullard Oldsmobile, Inc., 529 So.2d 943, 946 (Ala. 1988). Denying a motion for a new trial is within the sound discretion of the trial court. See Hill v. Cherry, 379 So.2d 590 (Ala. 1980). This Court will not reverse a judgment on a jury verdict on a weight-of-the-evidence basis unless the evidence, when viewed in a light most favorable to the nonmovant, shows that the verdict was plainly and palpably wrong and unjust. Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala. 1990). Furthermore, we have written the following regarding our review of a jury verdict:
 "[I]t is not for the trial judge, nor an appellate court, to attempt to determine with mathematical certainty that all of the various elements of evidence offered by the parties regarding specific costs and credits precisely equal the amount of the jury's verdict. We do not have trial by computer, nor do we have post-trial, or appellate, review by the computer. The reviewing court does not substitute its own judgment as to the amount of damages for that of the trier of fact."
G.M. Mosley Contractors, Inc. Phillips, 487 So.2d 876, 879 (Ala. 1986). See also Hollis v. Wyrosdich, 508 So.2d 704 (Ala. 1987). *Page 481 
The evidence submitted to the jury supported a verdict of $200,000 in compensatory damages. The jury heard evidence from which it could find that the athletic director not only misrepresented the facts to Coach Williams, but then failed to prevent him from detrimentally relying on those misrepresentations. The evidence indicates that, as a result of the misrepresentation, Coach Williams suffered extensive compensable damage. The record shows that during the 1996-97 school year, Coach Williams would have earned at least $45,000 had the representation from the athletic director been accurate. However, because ASU was not bound by the athletic director's representation and did not comply with it, Coach Williams was employed by ASU for only six weeks during the 1996-97 year. Furthermore, the record indicates that Coach Williams was not able to find another job until January 1997, and that that job was by contract for a six-month temporary position. Then, in August 1997, Coach Williams took a coaching job with Wallace State in Selma, where, so far as the record suggests, he remains employed to this day. Nevertheless, if Coach Williams had been employed at ASU in accordance with the terms of the athletic director's representations, he would have earned at least $45,000 in salary.[2] It is undisputed that Coach Williams's compensation at the two subsequent jobs was less than what the athletic director had offered him to work at ASU. The record shows that because he relied on the misrepresentation Coach Williams was forced to withdraw and deplete the funds he had on deposit with the State of Georgia retirement system. The evidence also shows that while he was unemployed, Coach Williams lived off the proceeds from credit-card charges, and that he eventually was unable to make his monthly payments. As a result, the credit-card companies assessed, in addition to interest on the unpaid balance, late charges, fines, and penalties, none of which Coach Williams would have incurred had the athletic director's representations been true.
The evidence further indicated that Coach Williams suffered extensive loss or damage apart from the monetary loss demonstrated in the record. He gave substantial testimony regarding the mental anguish he claimed to have suffered. The record shows the following testimony from Coach Williams:
"Q. Did you suffer financially?
"A. Yes.
"Q. Do you have a family, Coach?
"A. I have two small kids.
"Q. Were you able to support your family?
"A. Not really.
"Q. Why?
 "A. Well, I didn't have the income to do — you know, especially kids not living with you, too, so it made it even more harder.
". . . . *Page 482 
"Q. How did you feel [about being unemployed]?
 "A. Well, it wasn't great, you know, sitting in line waiting and waiting to be seen [at the employment office], to go from making close to $3,000 a month to making $300, $400 a month. And it's not — it doesn't feel very good. And you know, emotionally, you know, it was tough on me. It really was, just even — to walk in there.
". . . .
"Q. Would it be fair to say that you were depressed?
"A. Very.
". . . .
 "Q. Did you get — did you have problems paying your bills, Coach?
"A. Yes, I did.
"Q. Had you ever had problems before?
"A. No.
"Q. Were you struggling financially?
"A. Yes.
"Q. Were creditors calling?
"A. Yes.
"Q. Were creditors writing?
"A. Yes.
"Q. What did you tell them?
"A. `If I get some money, I'll pay you.'
"Q. Did they threaten you with lawsuits?
"A. Something like that.
". . . .
"Q. Well, were you depressed?
"A. Of course, I was."
The record is replete with testimony and other evidence indicating Coach Williams suffered mental anguish. We wrote in Foster v. Life InsuranceCo. of Georgia, 656 So.2d 333 (Ala. 1994):
 "We recognize that mental anguish and emotional distress are not items for which a precise amount of damages can be assessed; thus, in considering whether a jury verdict for compensatory damages is excessive, we must view the evidence from the plaintiff's perspective and determine what the evidence supports in terms of the plaintiff's suffering."
Id. at 337.
Furthermore, the facts of this case present a vivid contrast to the facts of Kmart Corp. v. Kyles, 723 So.2d 572 (Ala. 1998), as well as the facts of Delchamps, Inc. v. Bryant, 738 So.2d 824 (Ala. 1999). In Kmart, this Court held that, because the plaintiff had failed to testify about her mental anguish, her mental-anguish damages award should be reduced from $100,000 to $15,000. In Delchamps, the plaintiff testified that dealing with being arrested and prosecuted had been "hard" and that as a result of his arrest and prosecution he was "put through humiliation."Delchamps, Inc. v. Bryant, 738 So.2d 824, 837 (Ala. 1999). Consequently, the jury's award of mental-anguish damages was reduced from $400,000 to $100,000. Delchamps, supra, at 838. Unlike the plaintiffs in Kmart andDelchamps, Coach Williams testified extensively about the suffering he endured, and, while no specified monetary amount can be proved, the law leaves it to the jury to determine, according to the facts shown in the particular case, the amount appropriate to compensate for such an injury. The defendant has not shown the compensatory award to be excessive, and from our review of the record we conclude that the evidence justifies the jury's award of compensatory damages.
Finally, the athletic director argues that the punitive-damages award of $150,000 is excessive. In Green Oil Co. v. Hornsby, 539 So.2d 218,222 (Ala. 1989), we stated that "[b]ecause the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future, the proper amount of punitive damages rests largely within the jury's discretion." We added that while "punitive damages need bear no particular relationship to the actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence." Id. The exercise of jury discretion *Page 483 
is subject to judicial review to ensure that it is not the result of bias, passion, prejudice, corruption, or other improper motive. Land Assocs., Inc. v. Simmons, 562 So.2d 140, 150 (Ala. 1989); CityBank of Alabama v. Eskridge, 521 So.2d 931, 932 (Ala. 1988).
In Green Oil Co., we held that a court reviewing a punitive-damages award should consider the following factors:
Ratio of punitive damages to compensatory damages: Here, the jury found that the evidence supported an award of $200,000 in compensatory damages, greater than the punitive-damages award of $150,000. Therefore, the ratio of compensatory to punitive damages does not require a reduction of the punitive damages.
Reprehensibility: The evidence showed that the athletic director used fraud to entice a person to come work for him. Not only did this fraud adversely affect these two parties, but it also adversely affected Savannah State University, as well as Coach Williams's family and the ASU administration. Furthermore, when given the opportunity to remedy his misrepresentations, the athletic director neglected to do so.
Similar civil and criminal sanctions: This punitive award does not appear unusually large when compared with the punitive awards in similar cases.
Profitability of conduct: Granted, the athletic director did not obtain any direct profit from his conduct; however, had the athletic director not been able to hire a coach by mid-October 1995, then ASU's basketball program would have been adversely affected during the 1995-96 season.
Cost of litigation: The record contains no evidence of a dollar amount associated with this litigation. However, the action was filed on January 27, 1997, and resulted in a full trial. The plaintiff obviously incurred litigation expenses.
Financial position of the defendant: It is uncontroverted that at the time of the trial the defendant athletic director Williams had a net worth of approximately $60,000 (specifically, $59,903). Subtraction of the $200,000 compensatory-damages award would bring his net worth to a negative $140,000.
 "In dealing with compensatory damages, the interest of the uncompensated victim must always be kept foremost in mind. When considering punitive damages, however, the defendant's right to fair punishment must be considered above the plaintiff's right to recover the fullest amount of punitive damages."
Wilson v. Dukona Corp., 547 So.2d 70, 73 (Ala. 1989). (Citations omitted.)
By showing that he will have a negative net worth of $140,000 after paying the compensatory-damages award we are affirming, the defendant athletic director has shown that any award of punitive damages would be excessive.
This Court wrote in Wilson v. Dukona Corp.:
 "With regard to the jury's assessment of punitive damages, . . . what amount is sufficient to punish the Wilsons and to deter them, and others similarly situated, from committing similar acts in the future? Traditionally, the jury has been afforded a great deal of discretion in assessing punitive damages. The exercise of that discretion is, of course, subject to judicial review to [ensure] that the jury's award is not the result of bias, passion, prejudice, corruption, or other improper motive. This Court has recognized, however, that it is possible for a verdict to be excessive even when it is the result of a properly functioning jury. Green Oil Co. v. Hornsby, [539 So.2d 218 *Page 484 
(Ala. 1989)]. For example, in assessing punitive damages, the jury is not allowed to consider the financial position of the defendant, Southern Life Health Ins. Co. v. Whitman, 358 So.2d 1025 (Ala. 1977). The defendant's financial position is, however, a consideration essential to a post-judgment critique of a punitive damages award. Bearing in mind that punitive damages must not exceed an amount that will accomplish society's goals of punishment and deterence, we recognize that it is possible for a jury to hear the evidence in the case, make findings of fact, correctly apply the law, and still, albeit unwittingly, assess damages that bear no reasonable relationship to the accomplishment of those goals. Green Oil Co. v. Hornsby, supra; see, also, Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125, 127-28 (Ala. 1981) (Jones, J., concurring specially).
 "In the present case, a hearing was held on the Wilsons' post-judgment motion. At that hearing, evidence of the Wilsons' financial position was presented to the trial court. . . . The bank has a mortgage on the Wilsons' house, which was still under construction, and on 63 acres of their land, securing a $40,000 construction loan. Mr. Wilson testified that he had spent about $35,000 on the house. The Wilsons owed approximately $7,000 on their car, which had a fair market value of approximately $8,000. They also own a truck, with a fair market value of approximately $600, and 10 cows. The Wilsons have no savings, nor do they own any certificates of deposit, stocks, bonds, precious metals, or any other items of personal property with significant value.
 "The Wilsons do own approximately 463 acres of land having a fair market value of about $200 per acre. Four hundred of those 463 acres were a part of the estate of Mr. Wilson's father. After the death of Mr. Wilson's father, the Wilsons acquired the various interests held by Mr. Wilson's mother and his brothers and sisters. In fact, the Wilsons sold the timber to Parks to raise the funds to pay off a bank loan that was used to purchase the interest of one of Mr. Wilson's sisters — the only remaining outstanding interest in the estate land — and to make certain improvements to their land. The remaining 63 acres, as previously stated, are mortgaged to the bank. Mr. Wilson was raised in Jackson County and, after living in Illinois for 29 years, moved back to Alabama, hoping to build a house on his land and to retire with his wife.
". . . .
 "Without excusing the Wilsons' actions in cutting their neighbors' timber, we, nonetheless, believe that the trial court erred in not remitting the judgment by the amount of the punitive damages awarded (i.e., $21,450). In our view, an award of punitive damages, under the facts of this case, would do nothing to further society's goals of punishment and deterence. Therefore, the maximum amount that is legally recoverable from the Wilsons is $61,127.60 (this figure representing the $41,000 judgment entered in favor of Parks and Cox and a judgment based on the jury's verdict in favor of the plaintiffs in the amount of $20,127.60, should the plaintiffs accept a remittitur of $21,450).
 "Therefore, we hold that, by clearly showing at the post-judgment hearing that the punitive damages awarded were excessive, the Wilsons overcame the presumption of correctness that attached to the jury's verdict."
Wilson v. Dukona Corp., 547 So.2d at 73-74. (Citations omitted.) *Page 485 
We affirm the judgment to the extent it makes a compensatory award of $200,000, on the condition that Coach Williams file with this Court, within 30 days, a remittitur of all punitive damages; otherwise, the judgment will be reversed and the case remanded for a new trial. The appeal in case no. 1981824 is dismissed (see note 1).
1981613 — AFFIRMED CONDITIONALLY.
1981824 — APPEAL DISMISSED.
Hooper, C.J., and Maddox, Houston, See, Lyons, Brown, Johnstone, and England, JJ., concur.
Cook, J., concurs in the result.
[1] Athletic Director Williams actually appealed twice. We consider his first appeal (case no. 1981613) to be effective, and the second appeal (case no. 1981824) to be unnecessary. See Rule 4(a)(5), Ala.R.App.P. Therefore, the second appeal will be dismissed.
[2] Evidence in the record also indicates that ASU had provided Coach Williams with $5,000 in additional compensation as a bonus, and we presume that if he had been employed for the 1996-97 year he would have received the same benefit for that year.