[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 910 
The defendants Stephen Lawrence Martin, the Alabama Education Association ("AEA"), and Hornady Truck Line, Inc. ("Hornady"), appeal from judgments entered on jury verdicts for the plaintiffs Don Emerson Meadows, Sandra Meadows, Chantz Meadows, and Mildred Dorman in consolidated cases all arising out of a single automobile accident. The plaintiffs asserted claims of negligence and wantonness against Hornady, Martin, and the AEA and a claim of negligent entrustment against the AEA.
The defendants argue that the trial court erred in not granting their motions for judgments as a matter of law, in not granting their motions for a new trial based upon the weight of the evidence, and in certain of its evidentiary rulings. The defendants also contend that the following compensatory damages awarded to the plaintiffs are excessive: Don Meadows — $2,000,000; Sandra Meadows — $1,000,000; Chantz Meadows — $1,500,000; and Mildred Dorman — $1,750,000. The jury awarded no punitive damages. We affirm. In resolving issues concerning the sufficiency and weight of the evidence, this Court is to view the facts and all inferences that could be drawn from those facts most favorably toward the nonmovants, the plaintiffs in this case. This Court stated the standard for reviewing a ruling on a motion for a judgment as a matter of law in Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31
(Ala. 1999):
 "When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350
(Ala. 1992). For actions filed after June 11, 1987, the nonmovant must present `substantial evidence' in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724
(Ala. 1996)."
As to a denial of a motion for a new trial, this Court stated inAcceptance Insurance Co. v. Brown, 832 So.2d 1 (Ala. 2001):
 "The denial of a motion for a new trial is within the sound discretion of the trial court. Williams v. Williams, 786 So.2d 477, 479 (Ala. 2000). . . .
 "`"The jury's verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of the motion for a new trial."' Williams, supra, 786 So.2d at 480 (quoting Friendly Credit Union v. Campbell, 579 So.2d 1288, 1291
(Ala. 1991)) (other citations omitted). Moreover, `[t]his Court will not reverse a judgment on a jury verdict on a weight-of-the-evidence *Page 912 
basis unless the evidence, when viewed in a light most favorable to the nonmovant, shows that the verdict was plainly and palpably wrong and unjust.' Id."
The injuries to the Meadowses and Dorman occurred when an automobile, owned by the AEA and being driven by Martin, an AEA employee acting in the line and scope of his employment, which was headed north on Interstate 65, crossed the grass median separating the northbound and southbound lanes of traffic, entered the southbound lane, and crashed into the Meadowses' vehicle, which was traveling in the southbound lane. The Meadowses' vehicle was being driven by Don at a speed of between 50 and 55 miles per hour (less than the 70 miles per hour posted speed) because of weather conditions. Don testified that the AEA vehicle looked like a "silver blur" before it crashed into the Meadowses' vehicle, injuring the occupants — Don, Sandra, and Chantz. Mildred Dorman, a passenger in the front seat of the AEA vehicle, was also injured. It is undisputed that Don could have done nothing to avoid the accident. It is also undisputed that a northbound automobile is prohibited from driving in the southbound lane of an interstate highway. It is undisputed that each of the Meadowses and Mildred Dorman were injured as a result of this collision.
Martin and the AEA contend that Hornady and Lonnie Johnson, an employee of Hornady who was driving a Hornady truck and acting within the line and scope of his employment,[1] were responsible for the accident; Hornady contends that Martin was responsible for the collision. The jury found that negligence and wantonness on the parts of Martin, the AEA, and Hornady combined to cause the accident and the plaintiffs' injuries.
On June 16, 2000, Johnson, who was driving an 18-wheel tractor-trailer truck owned by Hornady, and Martin, who was driving an AEA-owned Ford Crown Victoria automobile, were both traveling north on I-65 during a severe thunderstorm. There had been a downpour of rain, and it was still raining at the time of impact. Johnson, occupying the right lane of I-65 north, was traveling alone and was driving the tractor-trailer truck at 65 miles per hour. Martin was traveling with Dorman in the front passenger seat and was operating his vehicle, with the cruise control set at a little under 70 miles per hour, and his headlights were on. Johnson admitted that, minutes before the accident, there was a "big downpour" of rain, and that it was "still coming down pretty good" when the accident occurred. Don, who was traveling south on I-65 at the same time with his wife Sandra and son Chantz, testified as to the weather conditions; from his testimony it could reasonably be inferred that he believed 50 to 55 miles per hour was the maximum safe operating speed based on the weather and the condition of the road.
"Q. And why did you reduce your speed to 50 or 55?
 "A. Because it was so wet and so much water was on the road, heavy downpours and low visibility. I just couldn't see far out."
Evidence was presented indicating that partial hydroplaning of a vehicle can occur at speeds as low as 35 miles per hour and total hydroplaning can occur at around 50 miles per hour. Martin was driving the AEA automobile at a speed of a little less than 70 miles per hour, or almost 20 miles *Page 913 
per hour beyond the speed at which total hydroplaning can occur. Johnson testified that, although he was driving the Hornady tractor-trailer truck at a speed of 65 miles per hour, he was aware that "[y]ou can hydroplane at 45 miles an hour."
The trial court charged the jury, without objection, that the Alabama rules of the road require every person to drive "at a safe and appropriate speed . . . when special hazards exist . . . by reason of weather or highway conditions." Ala. Code 1975, § 32-5A-170; Claytonex rel. Clayton v. Fargason, 730 So.2d 160, 163-64 (Ala. 1999). Unchallenged jury charges become the law of the case, Louisville Nashville R.R. v. Atkins, 435 So.2d 1275 (Ala. 1983), even if they are erroneous. Clark v. Black, 630 So.2d 1012, 1017 (Ala. 1993).
The jury could reasonably have found that the speeds at which Martin and Johnson were driving were unsafe, although they were both driving within the posted speed limit.
The collision occurred as Martin and Johnson approached the bridge at Exit 34 on I-65. Despite the facts that the vehicles were approaching a bridge and that visibility was poor as a result of the rain and the spray from the tractor-trailer truck, Martin elected to pass the truck. To do so, he moved from the right lane into the left lane when he was five or more car lengths behind the tractor-trailer truck. Martin took no measures to slow down; he did not disengage the cruise control. As Martin was passing the Hornady tractor-trailer truck, in the spray of standing water thrown up by the tractor-trailer truck's nine left-side tires, his vehicle collided with the tractor-trailer truck.
According to Martin and Dorman, as Martin was attempting to pass the Hornady truck, the truck moved into the left lane without warning, struck the AEA vehicle on the passenger side, and knocked the vehicle across the grass median into the southbound lanes of I-65 and directly into the path of the Meadowses' vehicle. Although at trial Martin did not recall having said so, the investigating state troopers testified that Martin told them at the scene and in the hospital that at some point in the chain of events the AEA automobile hydroplaned and hit the tractor-trailer truck.
Johnson testified that he remained at all times in the right lane and that it was Martin who came into his lane. However, Johnson claimed that he became aware of the collision only after he felt the impact on his truck. Either way, Johnson admitted that he did not see what happened, and he admitted that he had not checked his side-view mirrors — something Hornady policy required him to do every 5 to 10 seconds — since he had gotten on I-65 two to three miles before the accident occurred.
From this evidence, the jury could have found that Johnson made a lane change without checking his side-view mirrors to ensure that the lane into which he was moving was clear and that he moved into the lane occupied by the AEA vehicle. Johnson testified that the entrance ramp to I-65 on the north side of Exit 34 was visible from the area where the impact occurred. The jury could have reasonably inferred that Johnson had reason to be making a lane change because he was approaching an entrance ramp onto I-65 and he may have instinctively been changing lanes to make room for potential traffic entering the highway. Johnson's own testimony supports a strong inference that he was moving into the left lane when he struck the Martin vehicle. When he "felt a bump" he "looked toward the right mirror." Johnson admitted that his habit and *Page 914 
practice is to look in his right-side mirror before he makes a lane change from the left lane to the right lane.
At trial, Johnson admitted that he had testified as follows in his deposition: "When I looked in the right mirror, I didn't see nothing, I cut back." Thus, from Johnson's own testimony, the jury could have reasonably inferred that the truck moved into the left lane and then began to correct to the right lane after making contact with Martin's vehicle.
Johnson had been trained extensively in the hazards of "drifting" or unconsciously steering into an adjacent lane of traffic. Hornady's training video, which addressed the hazards and susceptibility of the drifting phenomenon, was played in open court, and the jury could have questioned Johnson's credibility when he testified that he had "never, ever, even once" in his career as a truck driver drifted into an adjacent lane. Whether he drifted, or was intentionally changing lanes, the jury could have reasonably found from the sworn testimony of Dorman and Martin that Johnson crossed the center line of I-65 north into the lane then occupied by the AEA automobile. Johnson testified that making a lane change without checking his side-view mirror would be a "reckless act of driving."
The jury could also have found that Martin, once Johnson started to encroach into his lane, instead of moving further to the left or slowing down to make room for the truck or blowing his horn, hydroplaned because of his speed, his use of cruise control (i.e., his foot was not on the pedals), poor visibility, and the wet road conditions, and lost control of his vehicle and collided with the Hornady truck, and then with the Meadowses' vehicle.
According to Johnson, the right side of Martin's car "hung up" on the left side of the Hornady tractor-trailer truck for two or three seconds while the vehicles continued at 65 to 70 miles per hour before the vehicles disengaged. Once they disengaged, the Martin vehicle crossed the grass median into the southbound lanes of I-65 and directly into the path of the Meadowses' vehicle, where a second, and much more violent, collision occurred. The Meadowses' vehicle broadsided the AEA vehicle on the passenger side — the same side that had impacted with the Hornady truck; the focus of the impact was on the front passenger side where Dorman was seated.
Hornady's entire theory of how this collision occurred, including the opinions of its reconstruction expert, hinged upon skid marks found near the scene consistent with those of a tractor-trailer truck. However, before trial, Johnson testified unequivocally that he did not apply his brakes until after he passed over the bridge, and he denied leaving any skid marks on the road. Although he changed his testimony at trial, the jury was free to believe his original sworn testimony, which was before them. Because Johnson himself at one time denied leaving any skid marks at the scene, and because no witness saw Hornady's tractor-trailer truck skid, the jury could have reasonably inferred that the skid marks used by Hornady's expert to determine the point of impact between the tractor-trailer truck and the AEA automobile had been made by another tractor-trailer truck.
Hornady's expert prepared the only diagram drawn to scale of the accident scene showing the final resting positions of the vehicles and the location of the skid marks. The diagram prepared by the investigating state trooper was indisputably not to scale. The Meadowses argued that when one compares the scale diagram prepared by Hornady's expert, which *Page 915 
shows the location of the skid marks in relation to the other accident-scene landmarks (which diagram was before the jury during trial and was taken with it to the jury room), with the scene photograph that shows a tractor-trailer truck (not the Hornady tractor-trailer truck involved in the accident) parked on the right shoulder of the northbound lanes, the skid marks match the location of this other tractor-trailer truck. The jury could have found that Johnson told the truth when he testified he did not apply the brakes at the point where the skid marks began. Thus, the jury could have disregarded all of the testimony of Hornady's expert because it was based on skid marks the jury believed were not made by the Hornady tractor-trailer truck.
 "`Negligence' is defined as `refer[ring] only to that legal delinquency which results whenever a man fails to exhibit the care which he ought to exhibit, whether it be slight, ordinary, or great.' Black's Law Dictionary 1032 (6th ed. 1990). . . . When determining whether a person exercised the care he should have exercised in regard to a particular situation, the trier of fact should take into account the state of mind that person had regarding dangerous conditions that may have existed in the particular area where the situation occurred."
Clayton, 730 So.2d at 163-64.
Johnson and Martin knew the weather conditions; they knew the road conditions; they each knew the speed at which their vehicles were traveling. Don Meadows, who was separated from those vehicles by only a few hundred yards, thought that it was unsafe to operate his vehicle in excess of 50 to 55 miles per hour, even though the posted speed limit was 70 miles per hour. There was other evidence indicating that a speed of less than 35 miles per hour is the maximum safe speed at which to operate a vehicle when water is standing on the road and that a vehicle operating in excess of 50 miles per hour in that condition is riding on water and is subject to the vicissitudes of wind or moving water.
The law of the case, as stated in the trial court's jury charge, was that Martin and Johnson had a duty to operate their vehicles "at a safe and appropriate speed when special hazards exist . . . by reason of weather or highway conditions." Martin was operating the AEA automobile by cruise control, which was set at a little less than 70 miles per hour; Johnson was driving the Hornady tractor-trailer truck at 65 miles per hour. Under the facts, speed alone was sufficient to allow the case to go to the jury on the negligence claim as to Martin and the AEA. Ala. Code 1975, § 32-5A-170; Clayton, supra. Under the facts, inattention alone was sufficient to allow the case to go to the jury on the negligence claim as to Hornady. Ala. Code 1975, §§ 32-5A-82(2) and32-5A-133(a); Winfrey v. Witherspoon's, Inc., 260 Ala. 371, 71 So.2d 37
(1954).
 "This Court has clarified the definition of wantonness in Alfa Mutual Insurance Co. v. Roush, 723 So.2d 1250, 1256 (Ala. 1998):
 "`"Wantonness" is statutorily defined as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, § 6-11-20(b)(3). "Wantonness" has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result. Bozeman v. Central Bank of the South, 646 So.2d 601 (Ala. 1994).'
 "This Court has often reiterated that while ordinary negligence involves *Page 916 
inadvertence, wantonness requires a showing of a conscious or an intentional act. Scott v. Villegas, 723 So.2d 642, 643 (Ala. 1998); Newman v. Bankers Fid. Life Ins. Co., 628 So.2d 439, 443 (Ala. 1993). However, '"the actor's knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference; it need not be proved by direct evidence."' Scott v. Villegas, 723 So.2d at 643, quoting Hamme v. CSX Transp., Inc., 621 So.2d 281, 283 (Ala. 1993).
 "This Court has held that while speed alone does not amount to wantonness, speed, coupled with other circumstances, may amount to wantonness. Knowles v. Poppell, 545 So.2d 40, 42 (Ala. 1989); Smith v. Cullen, 270 Ala. 92, 97, 116 So.2d 582, 586 (1959)."
Hicks v. Dunn, 819 So.2d 22, 24 (Ala. 2001).
Martin knew the road conditions; he knew his speed when he opted to pass Hornady's tractor-trailer truck; he knew that if he hydroplaned in the direction of the truck he would put Dorman, who was on the right side of the AEA vehicle next to the tractor-trailer truck, in harm's way. There was sufficient evidence to allow the case to go to the jury against Martin and the AEA on the wantonness claim. Martin testified that he does not know what happened after the impact between the AEA automobile and the Hornady tractor-trailer truck. The exhibits and testimony indicate that the AEA automobile traveled sideways (with the right, or passenger's side, of the automobile in front) in a northeastern direction across the northbound lane of the highway for approximately 60 feet and across the 50-foot-wide grass median for approximately 200 feet before it encroached on the southbound lane of traffic on I-65.
Evidence of what Martin did before the impact with the Hornady tractor-trailer truck was sufficient to permit the trial court to submit the wantonness claim against Martin and the AEA to the jury; the trial court did not err in refusing to grant a new trial on the weight of the evidence.
The speed of the Hornady tractor-trailer truck, coupled with the weather conditions, the failure of the driver of the tractor-trailer truck to check his side-view mirrors, Martin's testimony that without warning the tractor-trailer truck moved into the left lane and into the AEA automobile, was sufficient to permit the trial court to submit the wantonness claim against Hornady to the jury; the trial court did not err in refusing to grant a new trial on the weight of the evidence. Thrasherv. Darnell 275 Ala. 570, 156 So.2d 922 (1963).
Before the June 2000 collision, Martin had been cited for speeding six times since July 1996[2] and his driver's license had been suspended once during that time. On all of those occasions, Martin was driving an AEA vehicle, and the AEA was notified of the violations. The AEA never provided Martin with any special driver's training and never cautioned him about his driving. Clearly, Martin's speed was a proximate cause of this accident. The trial court did not err in submitting the negligent-entrustment claim against the AEA to the jury. Mason v. New,475 So.2d 854, 856 (Ala. 1985).
We have carefully reviewed the evidentiary rulings that the defendants have challenged; we find no prejudicial error. *Page 917 
See City of Birmingham v. Moore, 631 So.2d 972, 974 (Ala. 1994);Sweeney v. Purvis, 665 So.2d 926, 930 (Ala. 1995).
The jury awarded Don Meadows $2,000,000. Don's attorney, in his opening argument, argued to the jury that Don's compensatory damages were between $1,750,000 and $2,000,000. Hornady's attorney admitted in closing argument: "The Meadows family is not at fault. . . . They are entitled to a substantial judgment." The AEA and Martin's attorney admitted in closing argument: "The Meadows family had no role in it. . . . They deserve to be compensated. . . . We accept our responsibility. . . . We do not hide from our responsibility to the Meadows family." The defendants did not question the amount of compensatory damages suggested by the plaintiffs' attorney.
According to Don's testimony, the trauma to Don and his family began when "all of a sudden . . . [t]here was a car in front of me and a collision." Don felt around in the car after the crash to see if his wife and his son moved. "[I] didn't hear them say anything, but I could tell they were alive. I guess I was in and out." Don could "see a bone protruding out of [his] skin [on his arm], and the Jaws of Life cutting the door open." He was "in and out, gasping for breath."
The jury heard graphic details of Don's injuries through videotaped depositions of his treating health-care providers, Dr. Raymond Fletcher, Dr. John McAtee, and Dr. Graham Howorth, and from his physical therapist, Mark Staples.
Don was initially taken to North Baldwin County Hospital. Dr. Fletcher, an orthopedic surgeon, testified that Don "had an open fracture of the left ulnar shaft" and "a subtalar dislocation and multiple metatarsal fractures of the right foot." Don's heel bone was also fractured. In addition to placing pins in Don's foot, Dr. Fletcher put a metal plate in the forearm fracture to stabilize it. Don had a second surgery at North Baldwin on June 19.
On June 21, Don's condition became critical when he went into respiratory distress; he was taken by ambulance to Mobile Infirmary. Don testified: "I just remember the ambulance drive and not being able to breathe and getting there and being rushed down the hallway and still having a tough time breathing."
Dr. McAtee, the emergency-room physician on duty when Don arrived, described Don's treatment when he arrived at Mobile Infirmary. When Don arrived, he was "semi-comatose to comatose, very confused, lethargic to agitated, variable behavior based primarily on his hypoxemia, low oxygen." He was hyperventilating; he was in severe respiratory distress; and he was severely cyanotic, "which means blue color to the skin and to the lips and more importantly to the tongue, differentiating between central cyanosis . . . as opposed to just the fingers or the extremities being blue." "[I]t was apparent that he was about to arrest — have a cardiac and pulmonary arrest." He "was in critical condition, life-threatening condition."
Dr. McAtee intubated Don with a bronchoscope to visualize his lungs, to suction out any materials, and to assist Don's breathing.
 "A. [Dr. McAtee] And at the same time we began to ventilate him, we recognized . . . he had a flailed chest, . . . which is a particularly dangerous thing. So we immediately paralyzed him with an agent to give us total control of his ventilation so he would not have discordant ventilation. . . .
 "Normal people, when we inhale, the chest gets bigger, it expands, in a uniform fashion. When [Don] would inhale, *Page 918 
his sternum would cave in the opposite direction.
"Q. And what did that indicate to you, Doctor?
 "A. That means that he had a separation of the sternum from his ribs and — so there's no way really to get proper gas exchange if you have a flailed chest.
"Q. By separation, is that fracture?
"A. Fractures, right.
 "So when he inhales, the sternum would suck in abnormally instead of moving out. He also had some lateral rib fractures that caused the problem as well."
Don had pleural and pericardial effusions, and pulmonary contusion. Even though when Don arrived at Mobile Infirmary he was wearing a rebreather mask that supplied three times the normal amount of oxygen, his oxygen saturation was in the 50s; normal saturation is about 95, and a medical alarm will sound when saturation drops to 90. His symptoms constituted adult- respiratory-distress syndrome, ARDS. Dr. McAtee testified that "a patient with ARDS with the extent [Don] had, [their] mortality is 75% with a 25% chance of survival. And of those 25 that survive, probably half of them have permanent lung damage."
Dr. McAtee testified that Don's lung function will probably be impaired. He noted that "no question, he would have died" had Don not received emergency care at Mobile Infirmary. Dr. McAtee testified:
 "A. He's very lucky to have survived. When you see this many patients with this problem and the way he looked when he hit the [emergency-room] door, I thought he was going to arrest and die right there in the emergency room.
 "Q. Did you, of course, warn Sandy and the family of his condition?
"A. Correct."
Dr. Graham Howorth treated Don after his eventual return to his home in Alexander City. He testified that the types of fractures that Don suffered "are much more severe . . . [because they are] in the weight-bearing portion of the foot . . . where it causes severe arthritis with pain, limp and disability." Dr. Howorth testified that while he was treating Don, "He had moderate to severe episodes of pain, a lot of swelling." As to Don's limitations:
 "From his foot, he has a severe antalgic gait, which means he walks with pain. He really can't carry anything — you know, he can't carry anything more than a few feet. . . . I don't think he could really stand more than four to six hours in a day total at the very best. The pain may not allow him to do that. I don't think he can climb. I don't think he can accommodate unlevel surfaces."
Don is likely to walk with a limp for the rest of his life. Dr. Howorth testified that Don has a 22% impairment to the whole body, "excluding his chest injuries." "And a large — majority of that is due to his severe injury to his foot with injuries to his midfoot, his forefoot with angulation which causes him to have a severe antalgic or painful limp." Dr. Howorth also testified that Don will probably need additional surgeries on his foot.
When Don was released from the hospital on July 2, he went to his sister-in-law's house, where he stayed until mid-or late August. He explained, "They just had to wait on us hand and foot, you know. We had hospital beds in there." At first he was bedridden, then he was able to use a wheelchair, then a walker, later a crutch, and finally a cane. He had more than 15 or 20 physical therapy sessions. *Page 919 
In the 25 years before this accident, Don had not missed any long periods from work as a manager at Russell Corporation in Alexander City. November 1 (137 days after the accident) was the first day he was able to return to work, but he could not work six-to eight-hour days until February 1 and he was still required to take time off for physical therapy appointments. He was still working light duty at the time of trial. As of the date of trial there were things he could not do at work. The Russell Corporation plant is large, and Don's job is to monitor stock coming in, which requires him to walk up and down stairs and to walk longer distances than he can now comfortably walk.
Don's medical expenses totaled $110,715.13.
Before this accident, Don had an active life: he ran, played tennis, played softball, and hunted. He will never be able to run again. He takes pain medication for his foot, which he says helps for three or four hours by numbing the pain.
Sandra testified as to the extent of Don's suffering. She testified that Don still uses a bench in the shower because he cannot stand on his right leg to balance himself. Don cannot walk barefoot because of the sensitivity on the bottom of his foot. Sandra explained that her husband is not a complainer and that he does not display his feelings, but that the constant pain has been too much for him to suffer in silence:
 "[S]ometimes the pain has been so bad that naturally there is just so much you can take before you do express some sort of emotion over it, because it's frustrating to go week after week, you know, in constant pain. If the pain were just located in one place, maybe mentally you could deal with it, but to have several places hurting at one time and then your other family members, you want to feel and be sympathetic for them, too, but we were just all three in this thing together."
This testimony supports the compensatory damages the jury awarded Don because it shows his physical and mental suffering from his own injuries and from witnessing the suffering of his family members, who were in the accident with him (see Daniels v. East Alabama Paving, Inc.,740 So.2d 1033, 1049 (Ala. 1999)). Don has watched Sandra go through "a lot of agony. . . . [S]he's not like she was."
Don has a life expectancy of 29 years and 2 months, and the jury could have found that he faces a future of constant, ubiquitous pain.
The jury awarded Sandra Meadows $1,000,000. Sandra's attorney argued to the jury that Sandra's compensatory damages were between $750,000 and $1,000,000. The defendants' attorneys did not argue that those amounts were excessive, but as set out before the discussion of Don's injuries, admitted that each of the Meadowses was entitled "to be compensated"; the defendants' attorneys stated that each of them was "entitled to a substantial amount."
After the accident, Sandra was conscious briefly and remembers only that Don was feeling around for her and Chantz and asking if she and Chantz were alive. The next thing she remembers is lying on a table in the emergency room with a large ice pack on her face. She felt someone touch her shoulder, and realized that her sister and her brother-in-law had arrived. "When [my sister] saw my face, she had to leave the room and go be sick, I guess, because of all the bruising and swelling and my lips were busted."
Sandra's injuries and care were also explained through videotaped depositions of her health-care providers, Dr. Raymond *Page 920 
Fletcher and Dr. Graham Howorth, and her physical therapist, Mark Staples.
When Dr. Fletcher saw Sandra in the emergency room on June 16, she had fractured ribs on her right side and a pelvic fracture. She had a fracture of the ischium, a fracture of the pubis, and a fracture of the sacrum and coccyx. She also had posthemorrhagic anemia, which is caused by blood loss from the injury itself. She suffered a cerebral concussion with a loss of consciousness at the scene. Her pelvic fractures required bed rest and then the use of a wheelchair for approximately six weeks.
Dr. Howorth saw Sandra in Alexander City on June 27, 2000. "She had moderate to severe right leg pain and left inguinal or groin pain." There was "a lot of moisture [in her lung] that doesn't allow proper oxygenation." She also had fluid between the chest well and the lung itself. She had sciatica in her right buttocks and leg. She had an enlarged disc in her lumbar spine between vertebrae L4 and L5.
Sandra also had major shoulder surgery. She had persistent pain and weakness in her right shoulder from a complete tear of her supraspinatus muscle; because the shoulder damage was unresponsive to conservative measures, she had arthroscopy and a rotator-cuff reconstruction on October 19, 2000. The arm was then semi-immobilized for about six to eight weeks, and her motion and activities were limited for a period after that.
Dr. Howorth determined that Sandra had a 12% permanent impairment to her whole body as a result of the injuries she suffered in the accident.
Sandra was initially treated at North Baldwin County Hospital and was then released on June 21 to the care of her sister. As she was preparing to leave the hospital, she learned that her husband's condition had taken a turn for the worse. She "got somebody to roll my wheelchair in there, so I could see him. And in about three minutes, they were just pushing us aside and rushed out with him." Sandra testified that the doctors told her that Don had only a 50-50 chance of surviving and "made me aware of how close Don was to leaving this world."
Sandra was taken to her sister's house. She had to be confined to bed for six weeks; therefore, she could not be with Don at Mobile Infirmary while he was in critical condition. "Chantz was in a wheelchair with two casts up to his knees and he had chest pain, although he didn't have broken ribs, and then all the disabilities that I had, it was impossible [to be with Don], as bad as we wanted to go."
Sandra had not had any low-back problems before the accident, but she now has a herniated disc in her lower back.
 "Q. What kind of problem . . . physically, do you have now as a result of the wreck?
 "A. [Sandra] Well, I still have shoulder pain from the rotator-cuff surgery and severe back pain and leg pain, like this week sitting in these hard chairs or riding for a long distance or standing too long in the same position. The main thing, I think, is from that sciatic nerve.
 "Q. The nerve that the doctor said runs down here near where you have the fracture?
"A. Right."
Sandra had 18 physical therapy sessions. She was given exercises to do at home also.
Sandra's medical bills totaled $29,090.64. Dr. Howorth also testified that Sandra, like Don, may need surgery in the future to relieve the pain she experiences from her herniated disc. *Page 921 
Sandra's job as a stylist for the fabric division of Russell Corporation was jeopardized by the physical consequences of the accident. As a fabric designer for career apparel garments, she has to travel, carrying a sample case, and "there is no way [she] can lift anything like that over my head any more," which she has to do when she carries her sample case onto an airplane. Sandra did not return to work after the accident in June until the second or third week in August; at that time she started working for four hours a day. After the rotator-cuff surgery, she was out of work at least four weeks and she then returned only for half-days.
Sandra testified as to the impact of this collision on her family's day-to-day routine. Her son Chantz cannot play sports anymore. Although Don had never suffered from depression, he has shown signs of depression since the accident. The family can no longer enjoy events like stock-car races and college football games, because Don cannot walk the distances necessary to attend those functions. Don has expressed frustration when he cannot do things that a normal 48-year-old ought to be able to do. He cannot climb a ladder to change lights or to clean gutters. He cannot do much work in the yard because there is little level ground on their lot for him to walk on. They live on Lake Martin, and Don used to enjoy water skiing, but he cannot do that anymore.
Sandra's life expectancy is 33 years and 6 months. The jury could reasonably infer that she will be physically limited and in pain for the remainder of her life as a result of this accident.
The jury awarded Chantz Meadows $1,500,000. Chantz's attorney argued to the jury that he should be awarded compensatory damages of $1,000,000 to $1,500,000. The defendants' attorneys did not argue that those amounts were excessive, but as noted earlier, admitted that each of the Meadowses was entitled "to be compensated" and that each of them was "entitled to a substantial amount."
Dr. Fletcher, Dr. Howorth, and Mark Staples testified by videotaped deposition as to Chantz's injuries. Dr. Fletcher described Chantz's initial injuries as follows:
 "He had a fracture of the right ankle on the inner side called the medial malleolus and it was nondisplaced — or mildly displaced and [I] just placed him in a cast. He had a dislocation with fracture of the left ankle and a closed reduction and was placed in a cast at that time."
His left ankle had a dislocation of the talus and he had a fracture of the fibula. The injury tore the deltoid ligament and "disrupted all of the soft tissue, ligaments, tendons, [and the] joint capsule."
Dr. Howorth saw Chantz in Alexander City on June 27, 2000, and identified fractures in both ankles. The injuries to Chantz's ankles constitute a 14% impairment to the whole body. According to Dr. Howorth, "That's a permanent impairment." Chantz also will need further surgery. He will have post-traumatic arthritis. Mark Staples testified as to the "restrictions and weakness" Chantz would suffer as a result of the injury to his left ankle.
At the time of the accident Chantz was a student at Jacksonville State University. He is not in school now, but he plans to finish his college degree. He cannot run, jump, climb, or walk long distances, or do things he liked to do before the accident. He still has a lot of soreness when he walks. If he missteps, his foot hurts, and it swells. His doctor has ordered him not to lift more than 25 pounds. Before the accident, he was in a fraternity and played on the fraternity's softball team and soccer *Page 922 
team. He can no longer play softball or soccer.
Chantz was an active, healthy 23-year-old young man at the time of the accident. He will never be able to run, jump, or climb again, or carry more than 25 pounds, because of the severe injury to his left foot and leg. The jury could have reasonably inferred that the injuries Chantz suffered as a result of the accident will seriously adversely affect the quality of his life for the remainder of his life, estimated to be 50 years and 2 months.
The jury awarded Dorman $1,750,000. Dorman's attorney in his opening argument argued to the jury that she should receive between $1,750,000 and $2,000,000 in compensatory damages. The attorneys for the defendants did not argue that those amounts were excessive.
Dorman has a life expectancy of 26 years. She had incurred $80,285.99 in medical expenses and lost wages of $9,604.71 before trial. She was able to return to work by working at home. There was evidence indicating that she was permanently injured and that she will incur additional future care expenses of $257,966 as a result of the accident.
Dorman has no memory of what happened after the impact with the Hornady tractor-trailer truck until she woke up in Mobile Infirmary a number of days later. Dorman was compressed in the passenger compartment; the exterior of the automobile had collapsed by 18 to 20 inches on top of her. A paramedic testified that he was unable to obtain a blood-pressure reading from Dorman at the scene. She was taken to North Baldwin County Hospital and was immediately transferred by helicopter to Mobile Infirmary because her condition was critical. Dorman's right femur was driven through her right hip socket, shattering the hip socket as well as numerous bones in her pelvic girdle. The injury was so severe that initially surgery was not a possibility, so a hole was drilled through Dorman's shin bone and she was placed in traction for six weeks, during which time she was told that she might never walk again.
For six months (June to January), Dorman was in virtually constant pain. She suffered extreme groin pain, hip pain, and pain as a result of traumatic arthritis. Her right leg was shorter than her left leg. In January, Dorman had a complete hip replacement, which was graphically described by Dr. William Bose in a videotaped deposition that was played for the jury. It will be necessary for Dorman to have at least one more hip replacement during her lifetime.
The rules governing a trial court's review in determining whether a jury's verdict for compensatory damages is excessive are clear:
 "A trial court may not substitute its judgment for that of the jury when the jury has returned a compensatory verdict that is clearly supported by the record. . . . `A trial court may not conditionally reduce a jury verdict merely because it believes the verdict overcompensates the plaintiff; . . . nor may the trial court substitute its judgment for that of the jury.'
 ". . . When there is no evidence before the court of any misconduct, bias, passion, prejudice, corruption, improper motive, or cause not consistent with the truth and the facts, there is no statutory authority to invade the province of the jury in awarding compensatory damages."
Pitt v. Century II, Inc., 631 So.2d 235, 239-40 (Ala. 1993).
A review of compensatory damages on the grounds of excessiveness must *Page 923 
focus on the plaintiff (as victim) and ask what the evidence supports in terms of the harm suffered by the plaintiff, viewing the evidence from the plaintiff's perspective.
A Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), hearing is not required in cases involving only compensatory damages. Pitt v.Century II, Inc., 631 So.2d at 238.
This case was tried by competent counsel before a competent judge. Each of the plaintiffs sustained serious life-threatening injuries that were also life-changing injuries, and the jury could have found that those injuries resulted from the combined negligence and wantonness of the defendants. The plaintiffs' attorneys, without objection or dispute from the defendants, placed a value on the plaintiffs' injuries; the jury agreed with the attorneys and awarded the maximum amount requested by the Meadowses' attorneys and the minimum amount requested by Dorman's attorneys. During closing arguments, the defendants did not challenge the figures presented by the plaintiffs as representing their compensatory damages. It seems like a contradiction for the defendants to now argue that the evidence would sustain substantial awards of damages for physical and mental suffering and impairment, but not so substantial as the amounts awarded. The size of the verdicts clearly did not shock the conscience of the trial court, who during the hearing to supplement the record, observed in regard to the excessiveness argument: "To me, based on what happened in this case, . . . the only thing I can say is I don't know how the Defendants can [challenge the amounts] with a straight face."
There have been cases in which the plaintiffs suffered little or no physical injury and this Court has reduced the compensatory awards. In most such cases, the evidence of injury was at most a questionable diminishment of joie de vivre. These cases, however, are different. The judgment of the trial court is affirmed.
AFFIRMED.
Moore, C.J., and Lyons, Harwood, and Woodall, JJ., concur.
[1] Johnson was originally named as a defendant, but he was voluntarily dismissed by all the plaintiffs during the trial of the case.
[2] Martin and the AEA's brief to this Court indicates that he had been ticketed for speeding seven times in that period.