992 So.2d 1252 (2008)
Ex parte VULCAN MATERIALS COMPANY.
(In re James Blizard d/b/a Blizard Construction Company and Hollywood Materials
v.
Jeffrey Chandler and Vulcan Materials Company).
1051184.
Supreme Court of Alabama.
April 25, 2008.
*1256 Matthew H. Lembke and Marc James Ayers of Bradley Arant Rose & White, LLP, Birmingham; Gary C. Huckaby of Bradley Arant Rose & White, LLP, Huntsville; and Gerald R. Paulk, Scottsboro, for petitioner.
Michael A. Vercher and Thomas W. Christian of Christian & Small, LLP, Birmingham; John H. Graham, Scottsboro; and J. David Dodd of Scruggs, Dodd, Dodd & Bazemore, Fort Payne, for respondents.
WOODALL, Justice.[1]
This petition for writ of mandamus seeks review of a trial court's order regarding permissible posttrial discovery in response to a motion for a remittitur of a punitive-damages award. We deny the petition in part and grant it in part.

I. Facts
James Blizard, doing business as Blizard Construction Company and Hollywood Materials (collectively referred to as "Blizard"), sued Vulcan Materials Company ("Vulcan") and Jeffrey Chandler. The trial court submitted the case to a jury on counts of breach of contract, various species of fraud, intentional interference with contractual or business relations, and civil conspiracy. The jury returned a verdict for Blizard on claims of breach of contract and intentional interference with business relations, awarding compensatory damages *1257 of $130,000 and punitive damages of $3 million.[2] According to the parties, the trial court entered judgment on the jury verdict on February 1, 2006.
On March 1, 2006, Vulcan filed a "Renewed Motion for Judgment as a Matter of Law, or, in the Alternative, for New Trial, or, in the Further Alternative, for Remittitur and Constitutional Reduction of Punitive Damages." On March 9, 2006, Blizard served Vulcan with a postjudgment request for production of documents ("the request"). The request sought, in pertinent part:
"2. Any and all documents, including but not limited to, internal memoranda, press releases, notes, e-mail or correspondence circulated within Vulcan regarding this case and/or the verdict in this case.
"....
"8. Any and all balance sheets, income statements and/or financial statements generated by Vulcan for the past five (5) years.
"....
"10. Any and all documents, including but not limited to memoranda, reports and/or correspondence, whether prepared by you, your agents, employees or attorneys, that were provided to independent auditors and/or consultants regarding any other litigation against Vulcan in preparation of the Financial Reports, Annual Reports, and/or other required reports relating to Vulcan's finances for the past five (5) years or since this case has been pending, whichever is greater.
"11. Federal corporate tax returns for Vulcan for the past five (5) years.
"12. State corporate tax returns for Vulcan for the past five (5) years.
"13. Audit reports prepared by Vulcan's independent auditors for the past five (5) years.
"14. All documents and/or working papers provided to you by your independent auditors which were used to determine `materiality' in the audited financial statements during the periods described above.
"....
"19. Any and all copies of the Minutes of each meeting of the Vulcan Board of Directors or Trustees during the past five (5) years.
"....
"21. Any and all reports and any and all statements which Vulcan has made to its stockholders within the past five (5) years.
"22. Copies of the complaints in each lawsuit filed within the last five years in which Vulcan is named as a defendant.
"....
"24. Any and all documents, records, correspondence, e-mails, memos, statements, reports, papers or typed, printed or handwritten materials relating to the knowledge which Vulcan and/or its directors, managers or executive officers may have had during the past five (5) years with regard to verdicts and/or judgments rendered in the courts of Alabama during the past five (5) years.
"25. Any and all pleadings and/or documents that Vulcan has filed in other cases in the State of Alabama in which the excessiveness of punitive damages was challenged.

*1258 "26. A copy of all pleadings or documents that Vulcan has filed (or someone has filed on its behalf) in the state of Alabama or any other state in which it argued (even indirectly) it was entitled to punitive damages.
"27. An itemization of the fees and expenses paid to any attorney for the defense of this case.
"....
"35. Please supplement with updated information all your previous responses to requests for production."
Blizard also served Vulcan with postjudgment interrogatories ("the interrogatories"). The interrogatories stated, in pertinent part:
"20. State whether or not there have been, or are now, lawsuits pending against Vulcan claiming injury or damage from wrongful interference with business or contractual relations, improper restraint of trade, and/or improper price fixing. If so, for each lawsuit state:
"(a) the date of the filing of each such lawsuit;
"(b) the court in which such lawsuit was filed;
"(c) the nature of each such lawsuit;
"(d) the names and addresses of all parties, including plaintiffs and defendants to each such lawsuit;
"(e) a full and complete statement of the substance of all claims and allegations of each such suit;
"(f) the jurisdiction in which each such action was filed;
"(g) the jurisdiction in which each such action came or will come to trial if different from answer in (f);
"(h) the disposition of each such lawsuit; and
"(i) the name and address of each person or entity having possession, control or custody of any or all records relating to such legal action against this defendant involving such a claim or similar claim.
"....
"23. Please state the total amount of attorney's fees and expenses reimbursed and/or paid to your attorneys in this case. ...
"....
"24. Has Vulcan ever acquired rights in property which included an existing rock quarry and that another entity was operating (e.g., selling ag lime, producing rock for sale, etc.) in at the time of said acquisition? If so, please identify all such quarries and provide the name, address, and telephone number of each entity working in that quarry at the time of Vulcan's acquisition."
On April 10, 2006, Vulcan filed responses to the request and interrogatories, objecting to these discovery requests on grounds of relevance, overbreadth, undue burden, and attorney-client privilege. In particular, Vulcan objected to producing discovery of its financial wealth and condition, stating that such discovery was irrelevant because Vulcan was "expressly disclaim[ing]" reliance on its financial position as a reason for remitting the punitive damages awarded by the jury.
On April 19, 2006, Blizard filed a motion to compel Vulcan to respond to the posttrial discovery. On April 26, 2006, the trial court held a hearing on the motion to compel. Subsequently, on May 8, 2006, the trial court issued an order compelling Vulcan to respond within 21 days to the request and the interrogatories.
Eleven days later, on May 19, 2006, Vulcan filed a motion for a protective order and a conditional motion for a stay of all postjudgment discovery pending this Court's review of its petition for the writ of *1259 mandamus. In that motion, Vulcan stated that it had "already produced or [would] produce" documents sought in request no. 25, but limited to the last five years, and documents sought in request no. 26, but limited to those filed in the State of Alabama within the last five years. On May 23, 2006, the trial court denied the motion for a stay. It also denied the motion for a protective order, with one pertinent exception. It regarded Vulcan's motion as moot as it related to requests no. 25 and no. 26, stating: "[Vulcan] represented to the court that it had already answered [Blizard's] request."
On May 24, 2006, Vulcan filed its petition for a writ of mandamus, requesting an order directing the trial court to vacate its order requiring it to produce the information Blizard sought in the request and interrogatories listed above. More specifically, Vulcan argues that the trial court exceeded its discretion in ordering it to produce (1) all financial information it had generated within five years of the order; (2) information regarding Vulcan's involvement in, or knowledge of, other litigation without additional temporal or geographical restrictions; (3) minutes of meetings of its board of directors; (4) e-mail correspondence; (5) information relating to its acquisition of other quarries; (6) statements Vulcan made to its stockholders; (7) information regarding its attorney fees and litigation costs; and (8) supplementation of its preverdict discovery responses.

II. Standard of Review
"The trial court has broad and considerable discretion in controlling the discovery process and has the power to manage its affairs ... to ensure the orderly and expeditious disposition of cases." Salser v. K.I.W.I., S.A., 591 So.2d 454, 456 (Ala.1991). Therefore, this Court will not interfere with a trial court's ruling on a discovery matter unless this Court "`determines, based on all the facts that were before the trial court, that the trial court clearly [exceeded] its discretion.'" Ex parte Henry, 770 So.2d 76, 80 (Ala.2000) (quoting Ex parte Horton, 711 So.2d 979, 983 (Ala.1998)).
"A mandamus petition is a proper means of review to determine whether a trial court has [exceeded] its discretion in discovery matters." Ex parte Alabama Dep't of Human Res., 719 So.2d 194, 197 (Ala.1998). The petitioner seeking a writ of mandamus bears the affirmative burden of proving the existence of the conditions requisite for issuance of the writ. See Ex parte Ocwen Fed. Bank, FSB, 872 So.2d 810, 813 (Ala.2003). Mandamus relief is appropriate "when a discovery order compels the production of patently irrelevant or duplicative documents, such as to clearly constitute harassment or impose a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." Id.

III. Analysis

A. Blizard's Right to Posttrial Discovery of Vulcan's Financial Information
The trial court's order, to the extent it granted Blizard's motion to compel production of the information Blizard sought in requests no. 8 and nos. 11-14, requires Vulcan to produce all financial information it generated within five years preceding the order. Vulcan first contends that the trial court erred in ordering it to produce that information despite Vulcan's concession "that its financial position does not warrant reduction of the punitive award." Petition, at 7. According to Vulcan, its "concession rendered that information irrelevant to the post-trial analysis of [the] punitive award." Id. (emphasis added). Vulcan's petition requires this Court to *1260 determine, as a question of first impression, whether a defendant who has filed a motion for a remittitur of punitive damages may preclude posttrial discovery of its financial information by stipulating that it will not rely on its financial status as a ground for the remittitur. We answer that question in the affirmative.
Under Rule 26(b)(1), Ala. R. Civ. P., a party "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party." (Emphasis added.) Considerations relevant to a trial court's inquiry on a motion for a remittitur of punitive damages have been promulgated by the United States Supreme Court. In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), that Court set forth three "guideposts" for determining whether a punitive-damages award offends the United States Constitution. Those guideposts are "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (discussing the guideposts set forth in BMW).
Additionally, in its review of a punitive-damages award, this Court considers the factors set forth in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). Those factors include (1) the reprehensibility of the defendant's conduct; (2) the harm that actually occurred, or that is likely to occur, from the defendant's conduct; (3) the defendant's profit from its misconduct ("the profitability factor"); (4) the relationship between the defendant's financial position and the size of the punitive-damages award ("the relationship factor"); (5) the cost to the plaintiff of the litigation; (6) whether the defendant has been subject to criminal sanctions for similar conduct; and (7) other civil actions the defendant has been involved in arising out of similar conduct. See Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala. 2003) (discussing the Green Oil factors).
Blizard says that the financial evidence he seeks is discoverable under two of these Green Oil factors. Specifically, he argues that the evidence is relevant (1) to the relationship factor, and (2) to the profitability factor. We disagree.

1. Relationship factor.
"[T]he purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer ... from committing similar wrongs in the future." Green Oil, 539 So.2d at 222 (emphasis added). Society's goal is to deternot to destroythe wrongdoer. Id. To effectuate that purpose, a punitive-damages award "`ought to sting in order to deter.'" Id. (quoting Ridout's-Brown Serv., Inc. v. Holloway, 397 So.2d 125, 127 (Ala.1981) (Jones, J., concurring specially) (emphasis added)).
"A party does not have a right to a Hammond hearing on the question of the adequacy of punitive damages." Ex parte Weyerhaeuser Co., 702 So.2d 1227, 1229 (Ala.1996) (emphasis added). "In regard to punitive damages, the purpose of the Hammond hearing [at which the Green Oil factors are considered] is to protect a defendant against due process violations arising from an award of excessive *1261 damages." Id. (emphasis added). Indeed, where a jury has awarded punitive damages, a trial court may not, consistent with the right to a trial by a jury as guaranteed by Ala. Const.1901, § 11, order an additur of punitive damages under any, or any combination, of the Green Oil factors. Bozeman v. Busby, 639 So.2d 501, 502 (Ala.1994).
In that connection, Vulcan states:
"If a defendant has conceded that its financial position provides no basis for remittitur, then further discovery directed to that factor is pointless because a court's analysis of the factor will not change in any way based upon the relative wealth of the defendant. ... [W]hen presented with such a concession, there is simply nothing more for the court to consider."
Reply brief, at 7-8 (emphasis added). We agree. Because the Green Oil factors are considered for the benefit of defendants, a defendant may waive the benefit of one or more of the factors.
In fact, our cases have held that a defendant's failure to produce evidence of its net worth effectively negates the benefit to the defendant of the relationship factor. In other words, a defendant cannot argue as a basis for reducing the punitive-damages award that the award "stings" too much, in the absence of evidence of the defendant's financial status. See Shiv-Ram, 892 So.2d at 319 (defendant's concession that it was insured, coupled with the absence of "evidence that payment of the damages awarded [would] cause it any undue financial hardship.... weigh[ed] against a finding of excessiveness"); Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1220 (Ala. 1999) (where the defendant produced no evidence of its net worth or evidence "showing that the verdict [would] affect its future insurability," the relationship factor would not benefit the defendant); Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 981 (Ala.1998) (where the defendant "stipulated that it would not be crippled financially if it had to pay the punitive damages award," the relationship factor was of no benefit). Moreover, it has, indeed, been heldcorrectly, in our viewthat a defendant may avoid extensive inquiry into its financial affairs simply by stipulating to its net worth, Sprague v. Walter, 441 Pa.Super. 1, 62, 656 A.2d 890, 920 (1995) ("it is a sound defense strategy to prevent freewheeling financial discovery by stipulating to a specific net worth"), or to its ability to satisfy a punitive-damages award. Cobb v. Superior Ct. of California, 99 Cal.App.3d 543, 551, 160 Cal.Rptr. 561, 566-67 (1979) (inquiry into the effect of a verdict awarding punitive damages can often be satisfied by a "simple request for a stipulation").
Here, by expressly conceding "that its financial position does not warrant reduction of the punitive award," Petition, at 7, Vulcan has disclaimed reliance on the relationship factor as a reason for remitting the punitive-damages award. That disclaimer requires the trial court to weigh the relationship factor against a remittitur. Consequently, financial discovery as to that factor is unnecessary and irrelevant.

2. Profitability factor.
The parties dispute the relevance of evidence of a defendant's general financial status, or net worth, to the profitability factor. In Green Oil, this Court said: "`If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.'" 539 So.2d at 223 (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Houston, J., concurring specially)).
*1262 Blizard contends that the financial information he seeks in the requests is relevant to enable the trial court to determine whether the punitive-damages award exceeds the profit Vulcan realized from its wrongful conduct. However, according to Vulcan:
"While there may be circumstances where certain financial information could be relevant to [the profitability] factor, Blizard's notion that he can obtain sweeping discovery into all aspects of Vulcan's finances to advance his arguments with regard to that factor cannot be right. The key is that the factor seeks to remove the profit arising from the alleged conduct for which punitive damages are being imposed, not any profit generally."
Reply brief, at 9 (emphasis added). We agree with Vulcan. The profitability factor speaks to the particular conduct that occasioned the imposition of punitive damages. Evidence of Vulcan's general financial status is far too attenuated for useful analysis under the profitability factor.
In that connection, Vulcan did not object to Blizard's request for the production of documents ostensibly relevant to the specific circumstances at issue. In particular, Blizard sought in request no. 32, and Vulcan expressly agreed to produce, "[a]ny and all documents, items or things which reflect Vulcan's profit per ton of rock sold from the Scottsboro quarry for the past ten (10) years." However, Blizard's requests no. 8 and nos. 11-14 are not directed to, and do not reference, profit from the conduct underlying this litigation. Therefore, production of those documents would add little, or nothing, of value to a profitability analysis beyond what Vulcan has agreed to produce.[3]
For these reasons, we conclude that the trial court exceeded its discretion in denying Vulcan's motion for a protective order as to the financial information sought in requests no. 8 and nos. 11-14. Thus, we grant Vulcan's petition insofar as it is directed to that portion of the request.

B. Discovery of Other Litigation
According to Vulcan, "[t]he circuit court exceeded its discretion in requiring Vulcan to produce information concerning" Vulcan's involvement in, or knowledge of, other litigation, without regard to where or when the litigation was filed, "or whether the subject matter of the lawsuits was remotely similar to the claims made in this case." Petition, at 9. This argument relates to requests no. 10, no. 22, and no. 24, as well as to interrogatory no. 20. It should, of course, be noted that one of the inquiries is limited geographically to the State of Alabama (request no. 24), and some of the inquiries are temporally limited to five years (requests no. 10, no. 22, and no. 24), while one of the inquiries has neither temporal nor geographical limitations (interrogatory no. 20).
Without reasonable temporal and geographical limitations and subject-matter similarity, Vulcan argues, discovery of the requested material would be unduly burdensome and oppressive, as well as "ultimately irrelevant to the question of punitive damages." Petition, at 12. More specifically, Vulcan contends that a reasonable inquiry would be limited to litigation involving *1263 Vulcan in the State of Alabama within five years of this dispute. Id. We agree.
"`The first step in determining whether the court has [exceeded] its discretion is to determine the particularized need for discovery, in light of the nature of the claim.'" Ex parte Henry, 770 So.2d 76, 80 (Ala.2000) (quoting Ex parte Rowland, 669 So.2d 125, 127 (Ala.1995) (emphasis added)). To be relevant to a constitutionally sanctioned punitive-damages review, any extraterritorial conduct of the defendant "must have a nexus to the specific harm suffered by the plaintiff." Campbell, 538 U.S. at 422, 123 S.Ct. 1513 (emphasis added). An action in one state may not be "used as a platform to expose, and punish, the perceived deficiencies of [a defendant's] operations throughout the country." Campbell, 538 U.S. at 420, 123 S.Ct. 1513. "A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff...." 538 U.S. at 422-23, 123 S.Ct. 1513. This is so, because, "as a general rule," a State does not "have a legitimate concern in imposing punitive damages to punish defendants for unlawful acts committed outside of the State's jurisdiction." 538 U.S. at 421, 123 S.Ct. 1513. Thus, a litigant may not seek to support a punitive-damages award through discovery aimed at generic, undelineated out-of-state conduct.
Our recent cases have stated or applied similar principles, albeit in different terms, in the context of general pretrial discovery. The Court has insisted that discovery requests be "closely tailored" to the plaintiff's claims. Ex parte Horton, 711 So.2d 979, 983 (Ala.1998). Nationwide discovery has been held "overly broad and ... not closely tailored to the nature of the [plaintiff's claims]." Ex parte Henry, 770 So.2d at 80. See Ex parte Orkin, Inc., 960 So.2d 635, 642 (Ala.2006) (an order compelling production of customer files "stored in five states" was not closely tailored and could not be "sanctioned on the unsubstantiated hypothesis that a search of records related to nonparties might uncover fact patterns similar to" those underlying the plaintiffs' claims); Ex parte National Sec. Ins. Co., 773 So.2d 461, 465 (Ala.2000) (an order limiting discovery to five years and to the borders of Alabama was "closely tailored" to the plaintiff's fraud allegations); see also Ex parte Union Sec. Life Ins. Co., 723 So.2d 34, 40 (Ala.1998) (the trial court exceeded its discretion in compelling production of "records from a seven-state area" in the "Southeast").
Furthermore, discovery requests must generally be subject to reasonable temporal limitations. In Ex parte Orkin, we said:
"No bright line exists concerning the maximum period over which a litigant should be required to search for records. The length of that period depends on whether the records being searched are `relevant to the subject matter involved in the dispute.' Rule 26(b)(1), Ala. R. Civ. P.; 8 Wright, Miller & Marcus, Federal Practice and Procedure § 2008 (1994). Even then, a litigant in a fraud action must show a substantial need for discovery of records that concern transactions with nonparties, that are older than five years, and that do not directly relate to the litigant's own claim or defense."
960 So.2d at 643 (emphasis added). See also Ex parte Ocwen Fed. Bank, FSB, supra (trial court did not exceed its discretion in restricting the discovery period to five years); Ex parte Wal-Mart, Inc., 809 So.2d 818, 822 (Ala.2001) (the trial court properly narrowed discovery of "customer *1264 incident reports and employee accident review forms to Alabama stores and to a five-year period"); Ex parte National Sec. Ins. Co., 773 So.2d at 465 (a discovery order limited to five years was proper); Ex parte Union Sec. Life Ins. Co., 723 So.2d at 39 (a discovery order limited to five years and to the borders of Alabama was proper). Although Orkin and some of the cases cited above involved fraud claims, it is well established that greater latitude is allowed for "discovery in a fraud case ... because of the heavy burden of proof imposed on one alleging fraud." 960 So.2d at 641. Thus, a fortiori, a temporally unlimited discovery order in a nonfraud case challenging a punitive-damages award, which is subject to the constitutional constraints outlined in BMW, supra, and Campbell, supra, is overly broad in the absence of a showing of a substantial need for the material sought.
The relevant claim in this case is intentional interference with contractual or business relations. Request no. 10 seeks production of "[a]ny and all documents ... provided to independent auditors ... regarding any other litigation against Vulcan... for the past five (5) years." Request no. 22 seeks production of "[c]opies of the complaints in each lawsuit filed [against Vulcan] within the last five years." Request no. 24 seeks production of "all documents, records, correspondence, ... or handwritten materials relating to the knowledge which Vulcan and/or its directors, managers or executive officers may have had during the past five (5) years with regard to ... judgments rendered in the courts of Alabama during the past five (5) years." (Emphasis added.) Interrogatory no. 20 seeks specific information on every lawsuit ever filed "against Vulcan claiming ... wrongful interference with business or contractual relations, improper restraint of trade, and/or improper price fixing."
Vulcan objects to the scope of the requests for information regarding other lawsuits or claims against it. In support of its argument, Vulcan presented the affidavit of William F. Denson III, "Senior Vice President, General Counsel, and Secretary" of Vulcan. He stated that Vulcan has been in operations for 49 years and that its business is international in scope, and he testified in detail regarding the difficulties and attendant costs of attempting to comply with Blizard's discovery requests.
In response, Blizard concedes that, to be relevant, evidence of out-of-state conduct must be "similar" to the conduct involved in this case. Blizard's brief, at 13-14. More specifically, he states: "Evidence of other similar acts of Vulcan is relevant to the trial court's analysis of the degree of reprehensibility of its conduct in a post-judgment analysis of the punitive damages awarded by the jury." Id. at 13. However, he makes no attempt to explain how the extraterritorial conduct of Vulcan that is apparently the subject of these discovery inquiries is similar, or closely tailored, to the litigation involved here. Request no. 24, for example, seeks to discover facts known to all Vulcan's management personnel wherever they resideregarding every Alabama judgment entered in a five-year period, regardless of the nature of such a judgment. In so doing, request no. 24 goes far beyond the scope of any legitimate inquiry. Request no. 24 is fatally flawed because of the conspicuous absence of similarity to, and nexus with, this litigation.
Requests no. 10 and no. 22 are similarly international in scope. Consequently, they are also not closely tailored to this litigation. In addition to being international in scope, interrogatory no. 20 places no temporal restriction on discovery of "transactions *1265 with nonparties," Ex parte Orkin, 960 So.2d at 643, and Blizard does not attempt to demonstrate a "substantial need for discovery of records ... that are older than five years." Id. Interrogatory no. 20, therefore, is impermissibly broad, failing both temporal and nexus requirements.
Blizard says "it is inaccurate to suggest that Alabama courts have refused to uphold all instances where a trial court did not impose time and area limitations on discovery requests." Blizard's brief, at 14 (emphasis added). For that proposition, however, he cites only Ex parte Philadelphia Life Insurance Co., 682 So.2d 392 (Ala.1996). It is true that in Ex parte Philadelphia Life, a fraud case, this Court refused to impose temporal or geographical restrictions on the plaintiffs' interrogatories and production requests. Philadelphia Life has not been cited by any court. It is obviously inconsistent with our more recent cases, and is hereby overruled.
We conclude, therefore, that the trial court exceeded its discretion in compelling production of requests no. 10, no. 22, and no. 24 and interrogatory no. 20. The petition is granted insofar as it relates to those discovery items.[4]

C. Discovery of Minutes of Vulcan's Board of Directors
Vulcan next contends that the trial court exceeded its discretion in compelling production of "[a]ny and all copies of the Minutes of each meeting of the Vulcan Board of Directors or Trustees during the past five (5) years." Request no. 19. As this case is postured, we agree.
Regarding the contents of these minutes, Denson's affidavit states:
"3. In my capacity as Secretary of the corporation, I am responsible for taking and maintaining the corporate minutes of all meetings of the board of Directors of the corporation.
"....
"6. Information contained in the Minutes includes material, nonpublic information as defined by the rules and regulations of the Securities and Exchange Commission. This material, nonpublic information does not in any manner concern the plaintiff or this litigation. As such, inadvertent or improper divulgence of this information could be a violation of the federal securities laws and regulations.
"7. There has been no reference to or mention of this litigation recorded in the Minutes of the Company during the last five years."
(Emphasis added.)
"The broad rules of discovery `should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and produce a variety of information which does not reasonably bear upon the issues in the case.' Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir.1992)...."
*1266 Ex parte Wal-Mart Stores, Inc., 682 So.2d 65, 68 (Ala.1996) (Hooper, C.J., dissenting) (emphasis added).
Blizard makes the conclusory statement that the minutes of Vulcan's board meetings are relevant to certain Green Oil factors. Blizard's brief, at 20-21. Significantly, however, he ignores the affidavit of Vulcan's secretary stating that those minutes do "not in any manner concern the plaintiff or this litigation" and contain "no reference to or mention of this litigation." In other words, Blizard makes no attempt to explain how the minutes, which do not concern or mention him or his case, might be relevant to a review of the punitive-damages award. That being so, request no. 19 contemplates what is essentially a "fishing expedition" to determine whether the statements in the affidavit are true. That is not the purpose or goal of permissible discovery. The trial court exceeded its discretion, therefore, in ordering Vulcan to produce the material sought by request no. 19, and as to it Vulcan's petition is granted.

D. Discovery of Vulcan's E-mails
Vulcan contends that the trial court exceeded its discretion in denying its motion for an order protecting against the production of "[a]ny and all ... e-mail or correspondence circulated within Vulcan regarding this case and/or the verdict in this case." Request no. 2. It insists that the burden of "gathering whatever e-mails exist" will subject it to "extraordinary expense." Petition, at 21.
Vulcan also insists that "[a]ny known e-mails pertaining to the issues in the case that were created before the case was filed have already been produced during the merits stage," and it argues that, "[b]y definition, every one of the e-mails now sought by Blizardas they were created after the case was filedwill have been prepared in anticipation of litigation and almost certainly will be protected by the work-product doctrine." Petition, at 20 (emphasis added). It further contends that "the e-mails will have no relevance to the assessment of punitive damages because they all were created after the time of the conduct upon which the punitive damages were assessed." Petition, at 21 (emphasis added).
While this petition was pending, we decided Ex parte Cooper Tire & Rubber Co., 987 So.2d 1090 (Ala.2007), which involved arguments by Cooper Tire & Rubber Company ("Cooper"), similar to those made here by Vulcan, "that its burden of production with respect to e-mails [would] entail thousands of hours and [would] cost hundreds of thousands of dollars." 987 So.2d at 1104. We said:
"With respect to Cooper's contentions that the quantity of materials to be produced for discovery ... is simply too vast to be managed without undue time and expense, we believe that the trial court's exercise of its discretion over the discovery process requires some reference to standards designed to address the technology of information that is available, or that can be made available, on electronic media....
"....
"... In light of [the] showing by Cooper, we believe that it is appropriate for the trial court to consider in more detail Cooper's arguments as to its cost of producing e-mails."
987 So.2d at 1104-1105 (emphasis added). We then acknowledged that, although neither the courts of this state nor the legislature has developed standards for discovery of electronically stored information, the federal court system has addressed such standards. We directed the trial court to consider Cooper's motion for a protective order in light of Fed.R.Civ.P. 26(b)(2)(B) *1267 ("Specific Limitations in Electronically Stored Information"), and the factors set forth in Wiginton v. CB Richard Ellis, Inc., 229 F.R.D. 568 (N.D.Ill.2004).
As we did in Cooper Tire & Rubber, we deny the petition as to the e-mails sought in request no. 2, but with directions for the trial court to reconsider Vulcan's motion for a protective order as to the e-mails sought in request no. 2 in light of the authorities cited and discussed in that case and in light of Vulcan's argument that the e-mails sought in request no. 2 will likely be work product and its contention that the e-mails would not likely lead to relevant information.

E. Discovery of Other Quarries
Interrogatory no. 24 asks whether "Vulcan [has] ever acquired rights in property which included an existing rock quarry and that another entity was operating (e.g., selling ag lime, producing rock for sale, etc.) in at the time of said acquisition." It then demands that Vulcan "identify all such quarries and provide the name, address, and telephone number of each entity working in that quarry at the time of Vulcan's acquisition." Vulcan responded to interrogatory no. 24 by producing the information relating to "every existing quarry that it [had] acquired in Alabama in the last 15 years," Petition, at 23-24, but, in its motion for a protective order, Vulcan objected to the production of information on extraterritorial acquisitions and acquisitions beyond 15 years on the grounds that it would be of "negligible benefit" to Blizard, and that "[r]equiring Vulcan to produce information relating to every quarry [to which] it has acquired the rights ... outside the State of Alabama since the date of its corporate inception [would be] unnecessary, unmanageable and unduly burdensome." Vulcan supported the latter contention with Denson's affidavit, which stated, in pertinent part:
"10. Following identification of all existing quarry locations, a search of all records relating to acquisition of these locations will be required. In addition to an estimated volume of 1,300 feet of paper at the corporate offices, an unknown volume of records at seven (7) division offices and over two hundred (200) quarry locations in twenty-one (21) states and Mexico will require extensive review time. The majority of the locations will require extensive review and cross-check of records to accurately respond to this request. A conservative estimate of the time required to locate and identify information in response to this request is 2,040 hours at a cost of $125.00 per hour. This time does not include any travel time and costs that will be necessary to execute a diligent search and review."
Vulcan also insists that compliance with the interrogatory would "certainly produce an enormous amount of wholly irrelevant information," because, it argues, "information regarding quarries in some other state or country that were owned by Vulcan 10 or 20much less 50years ago would not be relevant to the punitive damages analysis in this case." Reply brief, at 19. Blizard's only relevant response to this argument consists of a conclusory assertion that the information may yield "admissible evidence regarding the duration of Vulcan's conduct, the existence and frequency of similar past conduct, the degree of awareness of the hazards its conduct caused or is likely to cause, concealment or cover-up of its conduct, and whether the award will deter Vulcan's future conduct." Blizard's brief, at 22.
However, as we discussed in Part III.B. of this opinion, such nationwideand international discovery is "not closely tailored to the nature of the [plaintiff's *1268 claims]." Ex parte Henry, 770 So.2d 76, 80 (Ala.2000). This nexus principle is essential in the context of a punitive-damages review such as is involved here.
Likewise, as we noted above, a discovery order exceeding five years is temporally overbroad and improper in the absence of a showing of a substantial need for the materials sought. Clearly, Blizard has not demonstrated such a need for information predating the information of the past 15 years that Vulcan has already produced. For these reasons, the trial court exceeded its discretion in ordering Vulcan to produce the material sought by interrogatory no. 24. Thus, the petition is granted as it relates to interrogatory no. 24.

F. Discovery of Statements Made to Stockholders
Request no. 21 demands production of "[a]ny and all ... statements which Vulcan has made to its stockholders within the past five (5) years." (Emphasis added.) Vulcan contends that "there is no justification for such an onerous discovery demand." We agree. Indeed, Blizard's brief entirely omits any reference to this request. Because compelling production of request no. 21 was not a proper exercise of discretion, the petition is granted as to it.

G. Discovery of Vulcan's Attorney Fees
According to Vulcan, the trial court, in compelling Vulcan to respond to request no. 27 and interrogatory no. 23, erroneously required "Vulcan to produce detailed information concerning its attorneys' fees and other costs in this case." Petition, at 26. Vulcan argues that a defendant's litigation costs are irrelevant to "the cost of the litigation," the fifth factor enunciated in Green Oil, 539 So.2d at 223.
In Green Oil, this Court directed trial courts to consider "`[a]ll the costs of litigation... so as to encourage plaintiffs to bring wrongdoers to trial.'" 539 So.2d at 223 (emphasis added) (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d at 1062 (Houston, J., concurring specially)). Ordinarily, a defendant's litigation costs are, indeed, irrelevant for purposes of "encouraging plaintiffs to bring wrongdoers to trial." This Court's jurisprudence clarifies that this particular Green Oil factor is directed toward the plaintiff's litigation costs. See, e.g., Orkin Exterminating Co. v. Jeter, 832 So.2d 25, 42 (Ala.2001) (the litigation-cost factor enunciated in Green Oil requires a court to "consider whether the punitive-damages award was sufficient to reward the plaintiff's counsel for assuming the risk of bringing the lawsuit and to encourage other victims of wrongdoing to come forward." (emphasis added)).
Information relating to a defendant's attorney fees may be discoverable in a proper case, such as where a defendant places its litigation costs in issue by challenging the reasonableness of a prevailing plaintiff's request for attorney fees. Murray v. Stuckey's Inc., 153 F.R.D. 151, 152 (N.D.Iowa 1993) (discovery of information relating to defendants' attorney fees was permitted where the defendants "resisted plaintiffs' fee claim both on the basis of the number of hours claimed and the hourly rate applied"); Coalition to Save Our Children v. State Bd. of Educ. of Delaware, 143 F.R.D. 61, 64 (D.Del.1992) (discovery of information relating to defendant's attorney fees was permitted in response to the defendant's contention that the "plaintiff's hours overlapped and were unreasonable").
From all that appears, however, this is not such a case. There is no allegation that the reasonableness of Blizard's attorney fees is at issue. Thus, the trial *1269 court exceeded its discretion in ordering Vulcan to produce the material sought by request no. 27 and interrogatory no. 23, and as to that discovery, Vulcan's petition is granted.

H. Supplementation of Vulcan's Preverdict Responses
Finally, Vulcan contends that the trial court exceeded its discretion in compelling it to respond to request no. 35: "Please supplement with updated information all your previous responses to requests for production." (Emphasis added.) According to Vulcan, "[t]he discovery permitted in the post-judgment phase is... limited and different from the merits phase. [Blizard] has not offered, and cannot offer, any explanation as to why Vulcan should be put to the burden of supplementing all of its responses after the trial has been conducted." We agree. Indeed, Blizard's brief does not mention request no. 35 or seek to justify it. Consequently, we grant Vulcan's petition as to request no. 35.

IV. Conclusion
In summary, Vulcan's petition is granted and the writ of mandamus issued as to the requests and the interrogatories discussed above, except as to the production of e-mails in request no. 2. In that respect, the petition is denied and the trial court is directed to reconsider Vulcan's motion for a protective order in light of Cooper Tire & Rubber, supra, and the authorities cited therein.
PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
SEE, LYONS, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in the rationale in part and concurs in the result.
COBB, C.J., concurs in the result.
MURDOCK, Justice (concurring in the rationale in part and concurring in the result).

Introduction
I concur in the rationale of the main opinion except as to the discussion in that opinion of the discoverability and relevance of evidence of Vulcan's financial condition in the context of a Hammond/Green Oil analysis.[5] Even as to that issue, however, I agree with the result reached by the main opinionthat any information concerning Vulcan's financial condition other than what it already has produced or promised to produce is not properly discoverable. More than enough information (including, for example, ample information concerning Vulcan's income and net worth) to allow the plaintiff to address Vulcan's financial condition in a Hammond/Green Oil hearing already has been made available or promised by Vulcan. The plaintiff's remaining discovery requests in this regard are unduly broad and burdensome.
It is on this basis that I believe the result reached by the main opinion can and should rest.
I decline to join the main opinion to the extent it goes further to explain that any information concerning Vulcan's financial condition would necessarily be irrelevant in a Hammond/Green Oil hearing.
In Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), the Court established seven factors that, as a matter of state law, a trial court may consider in a postjudgment review of a jury's punitive-damages award. Factor number "4" is "the financial position *1270 of the defendant." 539 So.2d at 223. The analysis in the main opinion is based on the fact that the defendant in this case disavowed any reliance on this particular factor as a basis for a reduction of the punitive-damages award, even though it sought a reduction of that award on the basis of several other factors identified in Green Oil.
By disavowing any reliance on its financial condition, the defendant essentially stipulates that its financial condition is not so weak as to warrant a reduction in a punitive-damages award of a given amount. That is altogether different than stipulating that its financial condition is not so strong as to warrant maintaining the award at the level set by the juryor at least at a greater level than that to which the trial court, in the absence of any knowledge of a defendant's financial condition, might be inclined to reduce the award. To hold otherwise, which is the effect of the main opinion, puts the defendant in the self-serving position of stipulating that some reduced award amount being considered by the trial court will still be large enough to serve its purpose. It is the plaintiff, not the defendant, who naturally has the interest in seeing that that is true. Logically, it is only the plaintiff who should be in the position of stipulating that a reduction of a punitive-damages award being considered by the trial court will still leave the award at a high enough level.

Analysis
Most states do not wait until a postjudgment phase to allow the introduction of evidence of a defendant's financial condition. See, e.g., City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 270 n. 31, 101 S.Ct. 2748, 69 L.Ed.2d 616 and accompanying text (1981) (citing Restatement (Second) of Torts § 908(2) (1979), and D. Dobbs, Law of Remedies § 3.9, pp. 218-19 (1973), for the proposition that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded");[6]see also William A. Schroeder and Jerome A. Hoffman, Alabama Evidence § 4:21 (3d ed.2006) (noting that Alabama is "unlike most jurisdictions" in "not permit[ting] the jury to receive evidence of a defendant's wealth or lack of it `during the liability phase of the trial for the purpose of proving the amount of punitive damages that should be assessed.'" (citations omitted)).
In Alabama, however, we take the position (wisely, it would seem) that because it would impugn the fact-finding process regarding liability, evidence of the defendant's financial worth is inadmissible during the liability phase of the case. See, e.g., Southern Life & Health Ins. Co. v. Whitman, 358 So.2d 1025, 1026-27 (Ala. 1978). We therefore refrain from any attempt to measure the appropriateness of a punitive-damages award against the defendant's financial condition until after the jury has rendered its verdict. It is at that juncture, upon appropriate motion by the defendant, that our jurisprudence calls on the trial court "to determine the proper *1271 amount of recovery." Green Oil, 539 So.2d at 222 (emphasis added).[7]
Essential to the trial court's determination of the proper amount of the punitive-damages award is a determination that the presumption in favor of the award made by the jury has been rebutted. As the Green Oil Court explained, "the invocation of the trial court's authority under Ala. R. Civ. P. 59(f) to determine the proper amount of recovery and to deny a new trial, subject to filing of a remittitur of the amount in excess of the proper amount, is dependent upon the trial court's holding that the presumption of correctness of the jury verdict has been overcome by a clear showing that the amount of the verdict is excessive." 539 So.2d at 222 (emphasis added).
If the presumption of correctness of the jury verdict is overcome, however, it then falls to the trial court to decide "the proper amount" of the award. The inquiry that must be made is "[w]hat amount is sufficient to punish [the defendant] and deter it, and others similarly situated, from committing similar acts in the future?" 539 So.2d at 222. As the Green Oil Court further explained, the award "must not exceed an amount that will accomplish society's goals of punishment and deterrence," but at the same time "`the award ... ought to be large enough to hurt. It ought to sting in order to deter; that is its purpose.'" 539 So.2d at 222 (quoting Ridout's-Brown Serv., Inc. v. Holloway, 397 So.2d 125, 127 (Ala.1981) (Jones, J., concurring specially)). It is for this reason that "[t]he defendant's financial condition is ... a consideration essential to a post-judgment critique of a punitive damages award." 539 So.2d at 222.
I do not see how this Court can say that trial courts are to look to the so-called Green Oil factors to determine the appropriateness of punitive-damages awards, but, because of a self-serving stipulation by the defendant, not allow those same courts to consider the extent to which one or more of those factors support the award, or at least some award greater than that which the trial court otherwise would choose. Nor do I believe this Court has ever said this. I find no indication in our casesbefore today's decisionthat, where the task of the trial court is to decide what amount of punitive damages will be "proper," the financial condition of the defendant is not admissible both for the purpose of assessing what level of damages might be too much and for the purpose of assessing what reduced level of damages might not be enough.[8]
To lay the premise for its articulation of the seven factors, the Green Oil Court quoted at length from Justice Jones's special concurrence in Ridout's-Brown Service, Inc. v. Holloway:

*1272 "`That the law perforce furnishes not only a remedy but also allows substantial punitive damages for such a wrong goes without saying. I suppose what troubles me is the unguided discretion accorded in both the fact finding process and the judicial review that fixes the amount of punitive damages. The current system furnished virtually no yardstick for measuring the amount of the award over against the purpose of the award. We are all in agreement that the award in the instant case ought to be large enough to hurt. It ought to sting in order to deter; this is its purpose. But only in the rarest of cases should it be large enough to destroy; this is not its purpose.
"`Which of the twomerely to hurt or to destroydoes a $220,000 award accomplish here? I can readily agree that the gravity of the wrong, abundantly supported by the proof of record, justifies the full amount of this award; and, this being the sole cognizable standard, I am constrained to concur in the Per Curiam affirmance. But, still, in my opinion, something is missing; this standard is deficient. To the "gravity of the wrong" element should be added this inquiry: What (i.e., how much) will it take to punish this Defendant? The purpose of this two-fold test is to particularize both the wrongful act and the wrongdoer. Only when both elements the gravity of the wrongful act and the amount of damages necessary to punish the particular defendantare considered and weighed one against the other, can the award be rationally adjudged to accomplish the ultimate purpose of exemplary damages. [Emphasis [on "this"] in the original.]
"`The problem, then, is how to infuse the second of these elements into the equation. The firstthe extent and degree of the wrongis supplied in the liability fixing stage of the proceedings. Because it impermissibly impugns the fact finding process regarding liability, however, evidence of the defendant's financial worth is inadmissible. Southern Life & Health Ins. Co. v. Whitman, 358 So.2d 1025 (Ala.1978). The reliability of the fact finding process cannot be sacrificed in an unbifurcated proceeding by allowing evidence on the issue of damages which may unfairly influence the fact finder in resolving the issue of liability.
"`Thus, short of bifurcation with respect to the issues of liability and damages, the answer is to permit the injection of the second elementthe adequacy vel non of the damagesin a post-judgment proceeding by way of judicial review. For example, if the Defendant in the instant case were the individual mortician earning $20,000 per year, this fact should be admissible in support of a post-judgment motion on the issue of the validity of the award. The gravity of the wrong may be the same, whether the defendant is a salaried employee or a multimillion dollar corporation, but, in the case of the former, the $220,000 verdict would be far out of proportion to its intended purpose. What it takes to punish the one bears no relationship to what it takes to punish the other.

"`What I am saying is that, in the totality of the system, we must preserve the reliability of the fact finding process for adjudging liability and, at the same time, improve the reliability of the damages assessment process in order to fit the punishment (the amount of punitive damages) to the offensive conduct and the offender.' (Emphasis added.)"
539 So.2d at 222-23 (quoting Ridout's, 397 So.2d at 127-28 (Jones, J., concurring specially)) (emphasis added, except for emphasis *1273 on "this" as indicated and in the last paragraph).
As the Green Oil Court and Justice Jones explained, "`[o]nly when both elements the gravity of the wrongful act and the amount of damages necessary to punish the particular defendantare considered and weighed one against the other, can the award be rationally adjudged to accomplish the ultimate purpose of exemplary damages.'" 539 So.2d at 223. Before Green Oil, the process of assessing the appropriate amount of punitive damages involved "unguided discretion." The system was missing an appropriate "`yardstick for measuring the amount of the award over against the purpose of the award.'" 539 So.2d at 222. That "purpose," as recognized by the Green Oil Court in the immediately following sentence, is an award that is "`large enough to hurt. It ought to sting in order to deter; this is its purpose.'" 539 So.2d at 222. The problem, as the Court went on to explain, was how to "infuse" into "the equation" the evidence necessary to determine the amount of damages necessary to sufficiently punish the particular defendant in light of the fact that evidence of the defendant's financial condition was not admissible during the fact-finding process. The "answer," according to both Justice Jones and the Green Oil Court, was "`to permit the injection of the second element the adequacy vel non of the damages in a post-judgment proceeding by way of judicial review.'" 539 So.2d at 223.
Green Oil thus provided the "yardstick," the absence of which was lamented by Justice Jones. Obviously, a critical section of that "yardstick" is "the financial position of the defendant." Although this Court has held that the trial court may not add to the amount of a jury's award, that does not mean that the yardstick, within the parameters of $0 and the amount awarded by the jury, does not measure in both directions.
In other words, the submission of evidence in a Green Oil hearing is not a one-sided affair. The defendant never has had the right to introduce whatever evidence it could as to those particular Green Oil factors it believed would be favorable to it, while the plaintiff is unable to introduce "counter evidence" as to whichever of the Green Oil factors augered in its favor. To say otherwise will now allow the defendant, by stipulating that it does not rely on other Green Oil factors, to limit the trial court to considering evidence of only those Green Oil factors that favor the defendant's position. Until today, it has always been my understanding of the law that the plaintiff, in an effort to persuade the trial court that the presumption in favor of the jury's verdict should not be deemed rebutted or, if it is, that the verdict should not be reduced as much as the defendant urgesmay introduce evidence of any of the Green Oil factors, including any factors the defendant might have chosen to ignore because they hurt its cause.
It is my concern that the "something" provided by Green Oil will once again go missing from "the equation" as a result of today's decision. In its place, whenever a defendant unilaterally elects to exclude evidence of its financial condition from a Green Oil hearing, we will now have a "one size fits all" weight against remittitur. It would appear that such an approach is contrary to and would largely defeat the purpose sought to be achieved by Justice Jones and the Green Oil Court. Just how heavy is this weight against remittitur? How is it to be assessed in relation to such other factors as might be presented by the plaintiff against remittitur? Does it outweigh any other factor, or set of factors, that might be presented by the defendant in favor of remittitur? How does it *1274 "measure up" against such other factors? We will no longer be able to know these things because a critical section of the "yardstick" will be missing.
Nor do I find satisfactory the answer suggested by Chief Justice Cobb to these queries. If her reading of the main opinion is correct, a trial court must now assign "the most extreme weight to the disclaimed factor." 992 So.2d at 1275 (Cobb, C.J., concurring in the result). But again, how heavy is that? How heavy is the heaviest? If this factor is to be given "the most extreme," or the heaviest, weight possible, does it not necessarily outweigh any other factor that might be presented, either for or against remittitur? Alternatively, if it would be possible for some other factor also to be entitled to "the most extreme" weight in the same case, how would the trial court compare these two factors? If, for example, the nature of the civil sanctions already levied against the defendant was deemed to weigh as heavily as that factor possibly could in favor of remittitur, what should the trial court do? I suggest that the trial court logically would not know what to do. "Something [would be] missing" from the equation it has been instructed to use.
Over the last 20 years, substantial questions have been raised regarding Alabama's system for determining punitive damages. The effort to answer these questions has well engaged both this Court and the United States Supreme Court in numerous cases. See, e.g., BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299 (Ala. 2003); Employees' Benefit Ass'n v. Grissett, 732 So.2d 968 (Ala.1998); Life Ins. Co. of Georgia v. Johnson, 725 So.2d 934 (Ala. 1998); Bozeman v. Busby, 639 So.2d 501 (Ala.1994); Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989); Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). The place at which we have arrived after much time and effort encompasses the procedures and factors prescribed by this Court in Green Oil. I believe the Court today unwittingly makes a fundamental alteration to our law in this area. Given the arduousness of the path we have traveled to get to where we are, or at least where we were before today's decision, I believe any significant change to our law in this area should be made expressly and with a full exposition of what is being accomplished and why. I therefore respectfully decline to join in that portion of the main opinion holding in essence that evidence of a defendant's financial condition is neither discoverable by the plaintiff nor admissible for the purpose of supporting the plaintiff's position whenever the defendant unilaterally decides that it will not rely on such evidence to support its position in a Green Oil hearing.
COBB, Chief Justice (concurring in the result).
I agree that some of Blizard's discovery requests are broader than is appropriate to elicit material relevant to, or likely to lead to evidence relevant to, the propriety of the jury's punitive-damages award. However, I write specially to clarify, in light of our jurisprudence, the implications of the Court's holding today that "a defendant who has filed a motion for a remittitur of punitive damages may preclude post-trial discovery of its financial information by stipulating that it will not rely on its financial status as a ground for the remittitur." 992 So.2d at 1260.
Punitive damages exist to accomplish society's goals of punishing and deterring egregious tortious conduct. See Green Oil Co. v. Hornsby, 539 So.2d 218, 222 (Ala. 1989) (discussing the purpose of punitive damages in the context of reviewing a *1275 punitive-damages award for excessiveness). Remittitur exists and the Green Oil factors were established for the benefit of defendants, insofar as the "benefit" in question is the defendant's "right to a fair punishment," Williams v. Williams, 786 So.2d 477, 483 (Ala.2000) (citing Wilson v. Dukona Corp., 547 So.2d 70, 73 (Ala.1989) (emphasis added)), and not the defendant's interest in avoiding punishment. Thus, the trial court's ultimate concern in ruling on a motion for a remittitur is one of fairness. Achieving a fair punishment requires the trial court to consider not only the factors outlined in Green Oil that benefit the defendant's interest in obtaining a favorable ruling, but also the factors that weigh in favor of upholding the punitive-damages award rendered by the jury. See, e.g., Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 981 (Ala.1998) (considering factors that favored, as well as factors that "weigh[ed] against," a finding that the punitive damages awarded were excessive, and reducing the award to an amount "sufficient to punish [the defendant] and to deter it from further [similar] conduct ..., without compromising [the defendant's] due process rights").
Today's decision should not be misunderstood as creating a rule that, on a motion for a remittitur, a trial court is to consider only the factors that benefit the defendant, or that the defendant chooses to place in issue. When a defendant disclaims reliance on a Green Oil factor and thereby precludes discovery into that factor, the defendant does more than merely "waive the benefit" of that factor. As explained in the main opinion, "[t]hat disclaimer requires the trial court to weigh the [disclaimed] factor against a remittitur." 992 So.2d at 1261 (emphasis added).
The main opinion does not address how much weight the trial court should assign the disclaimed factor. Far from escaping its obligations to produce requested relevant, non-privileged discovery, a defendant who successfully precludes discovery regarding a Green Oil factor by disclaiming reliance on that factor must undertake a heavy burden. Because the defendant in those circumstances effectively blocks the trial court from evaluating the true extent to which the disclaimed factor militates against a reduction in the award, the trial court should assign the most extreme weight to the disclaimed factor and give full consideration to that great weight in determining whether, and how much, to reduce the punitive-damages award. Otherwise, the main opinion provides the wrongdoing defendant with a means of avoiding a fair imposition of a punitive-damages award by simply "disclaiming" those Green Oil factors that most strongly militate against a remittitur of the punitive-damages award. Such a result is directly contrary to this Court's jurisprudence emphasizing that the purpose of punitive damages is to punish and deter egregious unlawful conduct and that the purpose of a remittitur is to protect the defendant's inalienable due-process "right to a fair punishment." Williams, 786 So.2d at 483 (citing Wilson, 547 So.2d at 73 (emphasis added)); see also, e.g., Green Oil, 539 So.2d at 222. Although our law requires a trial court to protect a defendant from unfair punishment, our law must never be read to undermine the court's duty to impose a fair punishment.
NOTES
[1] This case has previously been assigned to other Justices on this Court. It was reassigned to Justice Woodall on January 17, 2008.
[2] Vulcan and Blizard dispute whether the verdict form is inconsistent regarding which of the defendants is responsible for the compensatory-damages award. That dispute is beyond the scope of this petition, and nothing in this opinion is to be construed as determinative of whether the verdict is inconsistent in form or substance.
[3] Interestingly, Vulcan has also agreed to produce information as to its net worth for the years 2002 to 2005, in addition to "public financial reports which have been generated by Vulcan for the past five (5) years," as well as "all documents ... that [it provided] to independent auditors and/or consultants regarding this case in preparation of the Financial Reports ... relating to Vulcan's finances" since this case has been pending. Reply brief, at 10 n. 4.
[4] Vulcan's petition also addresses requests no. 25 and no. 26, which concern pleadings and/or documents filed by Vulcan. However, in its order denying Vulcan's motion for a protective order, the trial court characterized objections directed at requests no. 25 and no. 26 as moot. It apparently did so on the basis of Vulcan's representation that it would produce the documents sought in those requests but limited geographically to Alabama and temporally to five years. As we understand the court's order, the court accepted Vulcan's representation, and, by doing so, so limited the scope of requests no. 25 and no. 26. Thus, we deem it unnecessary to address Vulcan's arguments as to those discovery points.
[5] Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989).
[6] The Restatement provision cited by the Supreme Court in City of Newport states that "the character of the defendant's act, the nature and extent of the harm to the plaintiff ... and the wealth of the defendant" may properly be considered "[i]n assessing punitive damages." Restatement (Second) Torts § 908(2) (1979). The treatise relied upon by the Court states that "since the purpose of punitive damages is punishment and deterrence, the sum assessed, if it is to be effective at all, must be a sufficiently large one to have effect.... For these reasons, courts permit the ... introduc[tion of] evidence showing something of the defendant's financial resources." Dan B. Dobbs, Handbook on the Law of Remedies § 3.9 pp. 218-19 (West 1973).
[7] Cf. Ridout's-Brown Serv., Inc. v. Holloway, 397 So.2d 125, 126 (Ala. 1981) ("recogniz[ing] that, pursuant to [Ala.] Code 1975, § 12-22-71, where the only ground of reversal is the excessiveness of damages, the appellate court has the power to determine the proper amount of recovery....").
[8] Green Oil itself referenced the factors of "criminal sanctions" and "other civil actions" as factors that should be taken into account "in mitigation of the punitive damages award." 539 So.2d at 224. None of the other five factors are so limited. The factor in question is stated merely as follows: "The financial position of the defendant would be relevant." 539 So.2d at 223.

In Bozeman v. Busby, 639 So.2d 501, 502 (Ala. 1994), this Court held that a trial court may not order an additur of punitive damages. The reference in the text to a "reduced level of damages that might not be enough" is to one that would reflect too large a remittitur, i.e., a remittitur that results in a punitive-damages award that might not be large enough to accomplish the purpose of punitive damages.